UNITED STATES, Appellee

v.

Specialist Dwayne K. BROWN,
433–57–9992, United States
Army, Appellant.

ACMR 9100880.

U.S. Army Court of Criminal Appeals.

31 Oct. 1994.

For Appellant: Louis P. Font (argued); Thomas D. Ensign, Colonel Malcolm H. Squires, Jr., JAGC, Major Fran W. Walterhouse, JAGC, Captain Teresa L. Norris, JAGC (on brief).

For Appellee: Captain Louis E. Peraertz, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Joseph C. Swetnam, JAGC, Major Kenneth T. Grant, JAGC (on brief).

Amici curiae on behalf of appellant: Stephanie K. Rones (argued); Dennis Courtland Hayes (on brief)—For the National Association for the Advancement of Colored People.

Amici curiae on behalf of appellant: Keith M. Harrison (on brief); Lewis L. Maltby, Teresa C. Yates, Leslie A. Lei (Law Student)—For the American Civil Liberties Union National Task Force on Civil Liberties in the Workplace.

Amici curiae on behalf of appellant: Francis A. Boyle (on brief)—For the release from

imprisonment and reinstatement of the appellant.

Before GRAVELLE, JOHNSTON, and BAKER, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSTON, Judge:

Contrary to his pleas, the appellant was found guilty by a general court-martial composed of officer members of conspiring to organize a strike, unlawfully organizing and attempting to organize a strike, and soliciting others to participate in a strike in violation of Articles 81 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 934 (1988) [hereinafter UCMJ]. He was sentenced to a dishonorable discharge, confinement for one year, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the sentence.

This case has been referred to the court for review under the provisions of Article 66, UCMJ. Utilizing the standard of review in Article 66(c), UCMJ, we may affirm only such findings of guilty and the sentence as we find correct in law and fact and determine, on the basis of the entire record, should be approved.

Although the appellant has asserted several issues,[1] the key issues on appeal are whether the evidence presented at trial was factually and legally sufficient to sustain the conviction; whether the statute prohibiting military labor union activities is constitutional (see 10 U.S.C. § 976 (1988) [hereinafter Section 976]); and, whether the appellant's prosecution was tainted by unlawful command influence or racial bias. We have determined that the court-martial conviction was correct in law and fact and affirm.

### I.

The appellant, a black soldier from Lake Charles, Louisiana, was a member of the 3d Battalion, 156th Infantry Regiment (Mechanized), Louisiana National Guard. That unit was activated in November 1990 for participation in Operations Desert Shield and Desert Storm. The unit deployed from Fort Polk, Louisiana, to Fort Hood, Texas, for training in preparation for possible combat in Southwest Asia.

Preparations at Fort Hood for the recently activated citizen-soldiers were beset by many problems involving long hours, inadequate time off, pay problems, alleged racial discrimination, and perceived poor leadership. Morale was low. On 3 February 1991, the appellant met in the barracks with five other soldiers to determine what to do about their perceived problems. They decided to call a meeting for soldiers in the battalion to be

1. The appellant assigned numerous errors:
 I. THE FEDERAL ANTI–UNION STATUTE, TITLE 10, UNITED STATES CODE, SECTION 976, IS FATALLY OVERBROAD IN VIOLATION OF THE FIRST AMENDMENT BOTH FACIALLY AND AS APPLIED TO APPELLANT
 II. THE FINDINGS AND SENTENCE MUST BE SET ASIDE AND THE CHARGES DISMISSED BECAUSE THE ATMOSPHERE OF UNLAWFUL COMMAND INFLUENCE IN THIS CASE EFFECTIVELY PREVENTED BG SOLOMON FROM EXERCISING UNFETTERED AND INDEPENDENT DISCRETION IN DISPOSING OF APPELLANT'S CASE
 III. ARTICLE 86, UNIFORM CODE OF MILITARY JUSTICE, PREEMPTS A CLAUSE 3, ARTICLE 134 PROSECUTION ALLEGING VIOLATIONS OF THE FEDERAL ANTI–UNION STATUTE, 10 U.S.C. SECTION 976(C)
 IV. THE EVIDENCE IN THIS CASE IS INSUFFICIENT AS A MATTER OF FACT AND LAW TO CONVICT UNDER 10 U.S.C. SECTION 976(C) BECAUSE THAT STATUTE, BY ITS TERMS, DOES NOT APPLY TO APPELLANT'S ACTIONS

 V. THE MILITARY JUDGE IMPROPERLY DENIED APPELLANT'S CHALLENGES FOR CAUSE AGAINST MAJOR COURINGTON AND CAPTAIN MCDONALD
 VI. SPECIFICATIONS 1 AND 2 OF CHARGE II ARE MULTIPLICIOUS FOR FINDINGS WITH EACH OTHER AND FOR FINDINGS AND SENTENCE WITH CHARGE I AND ITS SPECIFICATION
 VII. THE MILITARY JUDGE ERRED BY PERMITTING TRIAL COUNSEL TO REPEATEDLY ARGUE FACTS NOT IN EVIDENCE DESPITE TRIAL DEFENSE COUNSEL'S TIMELY OBJECTIONS
 VIII. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY PERMITTING THE SPECULATIVE AND IRRELEVANT AGGRAVATION TESTIMONY OF COLONEL CATALANO CONCERNING THE SENTIMENT OF THE ACTIVE COMPONENT AND THE CIVILIAN POPULATION AND BY PERMITTING THE TRIAL COUNSEL TO ARGUE ON THE BASIS OF IMPROPER EVIDENCE

held behind the unit dining facility at 2000 hours on 5 February 1991. The appellant solicited other soldiers to attend the meeting and to sign a list agreeing to leave Fort Hood without authorization. Approximately 200 soldiers attended the meeting and talked about leaving Fort Hood or taking other concerted group actions. The unit chain of command was not involved in the meeting that, for most of those present, could be characterized as a "gripe session" concerning generalized complaints.

Although the appellant did not attend the meeting because he was detailed to guard duty, he subsequently joined with a small group of soldiers who decided they were going to travel by bus to Lake Charles, Louisiana, with as many other soldiers as possible in order to meet with the media to publicize their "grievances." To facilitate the unauthorized trip, the appellant completed the final arrangements with a commercial bus company for several chartered buses to transport 100 passengers from Fort Hood, Texas, to Lake Charles, Louisiana, on 7 February 1991, with a return trip scheduled for 14 February 1991. The appellant's efforts at coordinating the trip with other soldiers was interrupted in the early evening hours of 6 February 1991 when the Deputy Brigade Commander, Colonel Frank Catalano, addressed the assembled soldiers of the appellant's unit.

Colonel Catalano stood on top of a Bradley Fighting Vehicle in the unit motor pool. He ordered the massed soldiers to crowd around his platform as he talked to them about their numerous concerns. He spoke about the training situation and schedule, leave and pass policies, and other morale issues. He specifically mentioned that large numbers of soldiers of a sister unit, the 1st Battalion, 156th Infantry Regiment (Mechanized) from Shreveport, Louisiana, had attempted to solve similar concerns by going absent without leave (AWOL) from Fort Hood the previous evening. Colonel Catalano urged the soldiers not to follow that example, but to remain and train so that they would have the best chance of surviving combat. He told the soldiers that the training schedule was tied to the deployment schedule for reinforcing units in combat. He said that was why they had to stay on post and participate in a seven days a week, twenty-four hours a day, training program.

As the soldiers dispersed, Colonel Catalano testified that he heard some indications that a group of soldiers who were unhappy with their situation might attempt to go AWOL even though he had just spoken to them. Upon returning to the headquarters, Colonel Catalano acted on a hunch and called a local commercial bus company. He learned that two commercial buses had been chartered to leave the post gymnasium the next morning at 0400 hours. A short time later the bus company representative called to notify the command that the soldiers had changed the pick-up location to a local K–Mart store parking lot in Killeen, Texas. Colonel Catalano then prevailed upon the bus company to cancel the chartered buses as the soldiers did not have permission to leave Fort Hood.

After the session with Colonel Catalano, the appellant, along with approximately forty other soldiers, attended another meeting at 2100 hours near the dining facility. Prior to the meeting, the appellant invited other soldiers to attend. He also made arrangements with another soldier to drive a truck to take soldiers to the buses early the next morning. At the meeting, the appellant announced the bus fares and provided other details about the transportation leaving Fort Hood. He then left the meeting to "check up" to see why soldiers from two companies had not attended the most recent meeting.

At approximately 0400 the next morning, a large group of soldiers were apprehended outside and inside the barracks as they prepared to leave for the K–Mart parking lot to meet the buses. Later that day the appellant was questioned about his involvement. During his interview with criminal investigators, the appellant stated that the soldiers "were going to Lake Charles to talk to the news media, to protest the conditions that they were subjected to."

## II.

██ As a result of his activities in the incident, the appellant was convicted of conspiring to organize a strike in violation of

Article 81, UCMJ. Under military law, conspiracy is a separate and distinct offense prohibited by Article 81, UCMJ, 10 U.S.C. § 881. The existence of a conspiracy need not take any particular form or be manifested in any formal words. It is generally established by circumstantial evidence, and is usually manifested by the conduct of the parties. In addition, the conspiracy or agreement need not precede a substantive or overt act, but rather, may be "contemporaneous" with the offense. *See United States v. Matias,* 25 M.J. 356, 362 (C.M.A.1987), *cert. denied* 485 U.S. 968, 108 S.Ct. 1242, 99 L.Ed.2d 441 (1988); *United States v. Pete,* 39 M.J. 521, 525 (A.C.M.R.1994).

■ After reviewing the facts of this case, we are convinced that the evidence is factually and legally sufficient to sustain the appellant's conviction for conspiracy to organize a strike.

■ The appellant also was convicted of organizing and attempting to organize a strike in violation of the statute prohibiting military labor union activities. *See* 10 U.S.C. § 976 (1988) [hereinafter Section 976]. That provision is applicable to the appellant in court-martial proceedings under clause 3 of Article 134, UCMJ.

In pertinent part, the statute specifies:

(c) It shall be unlawful for any person—

. . . .

(3) to organize or attempt to organize, or participate in, any strike, picketing, march demonstration, or other similar form of concerted action involving members of the armed forces that is directed against the Government of the United States and that is intended to induce any civilian officer or employee, or any member of the armed forces, to—

. . . .

(C) make any change with respect to the terms or conditions of service in the armed forces of individual members of the armed forces; . . .

Section 976(c)(3)(C).

In *United States v. Pete,* this court construed the provisions of Section 976 as requiring union-related objectives in the concerted action attempted. 39 M.J. at 526. That case involved the same episode at Fort Hood with similar charges against Sergeant Pete. *Id.* at 524. In that case, the government proved that a conspiracy existed and that some soldiers in the unit were intent upon taking actions that violated Section 976. *Id.* at 526. This court set aside the conviction, however, as the evidence presented at trial did not establish beyond a reasonable doubt that Sergeant Pete participated in the conspiracy or that *his* conduct violated the statute. *Id.* at 527.

The issue presented in analyzing Section 976(c)(3) is whether the appellant's activities were the type of "concerted action involving members of the armed forces" that the statute proscribes. In *Pete* we determined that the statute extended to activities by any person acting in a "labor organizational, representational, or collective bargaining context." *Id.* at 526. We further noted in that case that the statute did not prohibit soldiers from joining groups not constituting a "military labor organization." *Id.* We concluded that if the intended results (i.e. negotiating or bargaining, recognizing a representative, or changing terms or conditions of service) were not present, the statute would not be violated.[2] *Id.*

In this case, the appellant sought repeatedly to show that his activities never involved efforts at establishing a "labor union," selecting representatives to act on behalf of the soldiers in dealing with their chain of command, or bargaining with their commanders about their training. We find, however, that the appellant's activities were undertaken in a collective effort with other soldiers that was specifically intended to force the chain of command to modify the training schedule and field operating conditions at Fort Hood. This effort to change

**2.** The holding in *Pete* was based on the factual insufficiency of evidence implicating Sergeant Pete. That case should not be misconstrued to indicate that participation in a "military labor organization" is a prerequisite for a violation of Section 976(c)(3)(C).

the terms or conditions of service was to be accomplished, not through an appeal to appropriate channels such as the Inspector General or chain of command, but through the impact of an en masse AWOL and resultant unfavorable publicity generated by media contacts.

The appellant and his co-conspirators avoided the external trappings of union activities, i.e., membership cards, solicitation for membership per se, union dues, etc. The appellant and other soldiers, however, clearly banded together in an informal group that attempted to organize and implement a seven-day-long "strike" within the military context for the purpose of forcing a change in their training conditions. Thus, we find that the appellant violated Section 976(c)(3) as incorporated into military law by Article 134.

### III.

The appellant contends that Section 976 is overbroad in that it impermissibly restricts constitutionally protected activities. Intertwined with this contention is an allegation that the statute is void for vagueness in that it fails to provide notice as to what conduct is prohibited. We have concluded however, that the statute, as written and as applied in this case is neither unconstitutionally vague nor overbroad.

The Supreme Court has held in a long line of cases that a statute is void for vagueness if its terms are so vague that those who might come within its prohibitions cannot determine with any degree of certainty whether their conduct would subject them to criminal liability. In *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) the Court stated that "a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.... [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

In examining Section 976 in an effort to determine whether it is impermissibly vague, we are struck with the precision of the statutory language. The statute, by its own terms, defines many of the key provisions. Assuming that some of the terms of the statute may be vague, the appellant can hardly argue with sincerity that his conduct did not fall within those portions of the statute whose meaning is clear. In the case at bar we "need to decide only whether appellant's conduct 'is plainly within' the terms of the statute, 'even though marginal cases could be' postulated 'where doubts might arise.'" *United States v. McGuinness*, 35 M.J. 149, 152 (C.M.A.1992) (quoting *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954)).

Further, even if portions of the statute are impermissibly vague, we note that a "statute which is otherwise vague may be saved by the inclusion of a scienter or *mens rea* requirement." *Franza v. Carey*, 518 F.Supp. 324, 334 (S.D.N.Y.1981). In this case, the scienter requirement is met by the inclusion in the statute that the concerted activity be intended to effect change that would not otherwise be adopted by the Army.

The appellant's contention that the statute is unconstitutionally overbroad in that it makes criminal an intolerable range of constitutionally protected conduct is also without merit. Rather than a new and severe restriction on the "right" of soldiers to "gripe and complain" about their perceived plight, the statute, as applied in this case, is a reasonable effort to limit impermissible bargaining activities between soldiers and their commanders.

The appellant was not required to answer at a court-martial for his conduct at the "gripe session" conducted prior to the efforts to leave Fort Hood. He knew that his actions were criminal when he helped organize an unauthorized seven-day exodus on chartered buses. In addition, we find that he anticipated and intended that the media attention to their trip would result in changes in training at Fort Hood. It is obvious from the face of Section 976 that the goal of the statute is to prohibit within the military the

kinds of traditional job actions that would be permissible in a labor relations context between employers and their employees. Therefore, although Section 976 as written may have some imprecision as to its sweep, there is no possibility that the appellant was surprised to learn that the criminal law proscribed his activities in conspiring to organize a walkout and attempting to bring that concerted activity to fruition.

We decline to follow the appellant's suggestion that merely because the statute might be applied at the trial level to constitutionally protected activity that we should find it invalid. Courts routinely construe statutes so as to avoid the statute's potential overbroad reach, apply the statute in the case before them, and leave the statute in place. *See Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990).

## IV.

### a.

■ The appellant contends that his conviction was tainted by unlawful command influence that prevented the convening authority from using his independent discretion in disposing of appellant's charges. The recently-renamed Court of Appeals for the Armed Forces "has long held that the appearance or existence of unlawful command influence creates a rebuttable presumption of prejudice." *United States v. Wallace,* 39 M.J. 284 (C.M.A.1994) quoting *United States v. Johnson,* 14 U.S.C.M.A. 548, 551, 34 C.M.R. 328, 331 (1964). Rule for Courts–Martial 306(a), prohibits a superior commander from "limit[ing] the discretion of a subordinate . . . on cases over which authority has not been withheld" from the subordinate.

After carefully considering the record of trial, the briefs, and affidavits submitted from the participants,[3] we hold that there was no unlawful command influence in this case that limited the discretion of Brigadier General (BG) Solomon. We note that BG Solomon was not a commander who had been directly involved or personally embarrassed by the incidents. He was advised in the

matter by the assigned trial counsel, Captain S, an officer in the office of the staff judge advocate. Significantly, BG Solomon denied that any persons had attempted to influence his disposition decision improperly. Although the facts of the case may have supported a mutiny charge, he was convinced that the charge alleging a violation of Section 976 would more accurately reflect exactly what happened in the incident.

### b.

The appellant also contends, in effect, that his prosecution was based on impermissible considerations of race. In his view, he was severely punished because he is a black soldier although he merely attempted what a group of white soldiers actually were able to accomplish. While the white soldiers received relatively minor administrative nonjudicial punishment, he was prosecuted at a general court-martial where he received a substantial sentence including confinement.

■ As a starting point in the analysis of the claim, we note that the government possesses "broad discretion" in determining whom to prosecute. *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). While the discretion to prosecute is broad, it is subject to constitutional constraints prohibiting the exercise of such discretion based on race or other invidious grounds. *See United States v. Petit,* 841 F.2d 1546, 1554 (11th Cir.), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988). This standard requires a showing that the law has been enforced by public authorities "with an evil eye and an unequal hand" to "make unjust and illegal discriminations between persons in similar circumstances." *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886).

■ The claimant bears a heavy burden to overcome the presumption of legal regularity in enforcement of the penal law by proving the three essential elements of a discriminatory prosecution claim: (1) that other violators similarly situated are generally not prosecuted; (2) that the selection of

3. *See United States v. Dykes,* 38 M.J. 270 (C.M.A. 1993).

the defendant was intentional or purposeful; and (3) that the selection was pursuant to an impermissible classification. *See United States v. Cyprian,* 756 F.Supp. 388 (N.D.Ind. 1991); *United States v. Hagen,* 25 M.J. 78 (C.M.A.1987), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 981 (1988); *United States v. Garwood,* 20 M.J. 148 (C.M.A.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 456 (1985). We will examine these elements of discriminatory prosecution in reverse order.

In this case, the alleged arbitrary classification was on the basis of race: white soldiers were not prosecuted for essentially the same conduct that resulted in a court-martial for the black appellant. There is no question that a decision to refer a case to court-martial based on race or national origin would be condemned by this court.

 When selective prosecution is alleged, the defendant must show "intentional or purposeful discrimination" in the sense that it is not enough that a particular enforcement policy has the effect of singling out those who happen to be in an impermissible class; there must have been an intent to single out that class. This factor of "discriminatory purpose implies that the decisionmaker" acted "because of" the "detrimental effect on an identifiable group." *Jones v. White,* 992 F.2d 1548, 1573 (11th Cir.1993). Consequently, we agree with those courts that generally have been unwilling to find discriminatory purpose merely on the basis of statistical data showing disparate impact. *Id.*

 We find that the record is devoid of anything showing "intentional or purposeful discrimination." We recognize that the decision to prosecute may be affected by a myriad of factors such as the strength of the evidence, the availability of witnesses, the culpability of the offender, and the need to send out various enforcement signals.

 In order to prove that the offenders not prosecuted were in fact "similarly situated," the defendant must prove: (1) that the offenders not prosecuted "engaged in essentially the same conduct as the defendant;" (2) "as a result of which they violated the same statutes that the defendant is charged with violating;" and, (3) that "the magnitude" of the violations by offenders not prosecuted "was not materially different from that of the defendant." *Cyprian,* 756 F.Supp. at 393.

In determining whether the two groups of soldiers were "similarly situated" we have examined the record of trial and the appellate submissions to determine the circumstances surrounding the two separate events. The group of mostly white soldiers departed Fort Hood on regularly scheduled commercial buses. Although many of their passes had been curtailed to limit their travel to fifty miles, for many of them their travel coincided with passes authorizing one or two days away from military duties. Many of the black soldiers, on the other hand, were to travel without extended passes on chartered buses that were not scheduled to return for seven days.

The Shreveport group appeared to be motivated by the desire to get time off in order to visit wives, girl friends, and family. The motivation of the Lake Charles group was grounded in protest and "sending a message" to the command. Contacts with the media by the first group appeared to be incidental to their arrival at home, while the second group attempted to coordinate media coverage for maximum impact of their exodus. While the former group merely left the installation, apparently frustrated that their passes had been changed, the latter group attempted to leave after having been specifically admonished by the Deputy Brigade Commander not to follow the example of the first group. He also reminded them about their duty to remain and train for impending deployment to the war zone.

The first group appeared to be composed of numerous soldiers who without much thought or planning decided to take time off and travel home. The second group was organized, had several identifiable ring leaders, conducted several meetings to decide what to do about their perceived plight, debated their options before deciding upon an exodus, and made a coordinated effort to disrupt the training schedule. While there appeared to be little proof available against

the first group, documentary evidence against the second group included a list of signatures of those who chose to participate, and a record of telephone calls showing extensive coordination.

Finally, we find that the first group bore the hallmarks of individual misconduct, while the second group manifested concerted illegal activity—i.e., a group effort that directly challenged military authority and discipline. Thus, we are satisfied that the factual distinctions between the two groups prove beyond all doubt that soldiers in the two groups were not "similarly situated" for purposes of selective prosecution.

There is one aspect of this issue that is so important that we want to emphasize it again: the appearance of the Deputy Brigade Commander before the predominantly black soldiers in the second group and his admonishment to them to stay and train was sufficient, *by itself*, to clearly demonstrate that the soldiers in the first group were not "similarly situated" for purposes of selective prosecution. Thus, any soldier in the second group who defied the commander and subsequently attempted to leave Fort Hood without authority subjected himself to the full measure of the sanctions under the UCMJ. Regardless of how many other similarities there may have been between the two groups, the appellant was told by a senior officer to remain at Fort Hood. He chose instead to continue to organize his comrades for the purpose of going AWOL en masse to garner publicity with the intent to pressure their commanders to change the training conditions. On this distinguishing fact alone, i.e., the specific admonishment by a senior deputy commander, the appellant lawfully could be subjected to the sanction of a court-martial even though he might otherwise be similarly situated to white soldiers in other units who were not prosecuted.[4]

## V.

We have carefully examined the remaining issues presented by the appellant and have determined that they are without merit.

4. Because of this significant distinction, a *DuBay* hearing to identify subtle differences between the two groups of soldiers would merely delay our disposition of the case. *See United States v. Hamilton,* 41 M.J. 32 (C.M.A.1994).

The findings of guilty and the sentence are affirmed.

Senior Judge GRAVELLE and Judge BAKER * concur.