UNITED STATES, Appellee

v.

Dwayne K. BROWN, Specialist
U.S. Army, Appellant.

No. 95–0376.
Crim.App. No. 9100880.

U.S. Court of Appeals for
the Armed Forces.

Argued March 25, 1996.

Decided Sept. 30, 1996.

For Appellant: *Captain Matthew A. Myers* (argued); *Lieutenant Colonel Michael L. Walters* (on brief).

For Appellee: *Captain John W. O'Brien* (argued); *Colonel John M. Smith* and *Lieutenant Colonel Eva M. Novak* (on brief).

*Opinion*

CRAWFORD, Judge:

Contrary to his pleas, appellant, a member of the Third Battalion, 156th Infantry Regiment (Mecha-

nized), was convicted of conspiracy to organize a strike, "organiz[ing] and attempt[ing] to organize" a strike, and soliciting soldiers to strike in violation of Articles 81 and 134, Uniform Code of Military Justice, 10 USC §§ 881 and 934, respectively. The convening authority approved the sentence of a dishonorable discharge, confinement for 1 year, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 41 MJ 504 (1994). We granted review of the following issues:

## I

WHETHER THE FEDERAL ANTI–UNION STATUTE, TITLE 10, UNITED STATES CODE, SECTION 976, IS FATALLY OVERBROAD IN VIOLATION OF THE FIRST AMENDMENT BOTH FACIALLY AND AS APPLIED TO APPELLANT.

## II

WHETHER THE FINDINGS AND SENTENCE MUST BE SET ASIDE AND THE CHARGES DISMISSED BECAUSE THE ATMOSPHERE OF UNLAWFUL COMMAND INFLUENCE IN THIS CASE EFFECTIVELY PREVENTED BG SOLOMON FROM EXERCISING UNFETTERED AND INDEPENDENT DISCRETION IN DISPOSING OF APPELLANT'S CASE.

We decide both issues against appellant.

## FACTS—ISSUE I

In November 1990, appellant was a member of the Louisiana National Guard which was mobilized for Desert Shield/Desert Storm and deployed to Fort Hood, Texas.

In January 1991, the Iraqi leader Sadam Hussein was notorious for threatening that his forces would use nuclear, chemical, and biological warheads, and was predicting that much blood would be shed by the Allies. *See, e.g.,* Rich Atkinson and Barton Gehlman, *Iraq Trying to Shelter Jets in Iran, U.S. Says,* Wash. Post, Jan. 29, 1991, at A4; *Hussein warns Iraq may employ 'equitable' arms,* Baltimore Sun, Jan. 29, 1991, at A1;

Peter Honey, *Shift to ground war likely to prompt Iraqi use of chemical arms,* Baltimore Sun, Jan. 29, 1991, at A1.

On February 3, 1991, after the air war had started, appellant met in the barracks with several other soldiers. They discussed their concerns and organized a battalion-wide meeting on February 5 to consider their complaints concerning living conditions, long hours, inadequate time off, pay problems, and perceived poor leadership.

Appellant did not attend the battalion-wide meeting because of guard duty. He subsequently joined the group of soldiers from the meeting and arranged for charter bus transportation from Fort Hood to back home. They also agreed that they would alert the media and publicize their complaints. There had been two previous meetings by these soldiers. Their plans to go home were interrupted when Brigade Commander Colonel Catalano decided to meet with the soldiers. He stood on top of a Bradley Fighting Vehicle and addressed the soldiers about their concerns. He urged them not to go home and stressed that by staying and training, they would have their best chance to survive in combat. When the bus company was told about what was happening, they canceled the charter bus that was to have taken the soldiers home.

After he addressed the soldiers, Colonel Catalano was informed that a number of them were still unhappy. After the discussion with Colonel Catalano, appellant arranged for another meeting with approximately 40 soldiers. At that time, he made arrangements for another soldier to drive a truck to take the soldiers to the bus the next morning, not knowing that the bus trip had been canceled. He then left the meeting to inquire why soldiers from other companies had not attended.

As a result of his actions, appellant was charged with a violation of 10 USC § 976, which provides:

(c) It shall be unlawful for any person—

\* \* \*

(3) to organize or attempt to organize, or participate in, any strike, picketing,

march, demonstration, or other similar form of concerted action involving members of the armed forces that is directed against the Government of the United States and that is intended to induce any civilian officer or employee, or any member of the armed forces, to—

\* \* \*

(C) make any change with respect to the terms or conditions of service in the armed forces of individual members of the armed forces; ...

\* \* \*

(g) Nothing in the section will limit the right of any member of the armed forces—

(1) to join or maintain membership in any organization or association not constituting a "military labor organization" ...;

(2) to present complaints or grievances concerning the terms or conditions of the service of such member in the armed forces in accordance with established military procedures;

(3) to seek or receive information or counseling from any source;

(4) to be represented by counsel in any legal or quasi-legal proceeding, in accordance with applicable laws and regulations;

(5) to petition Congress for redress of grievances; or

(6) to take such other administrative action to seek such administrative or judicial relief, as is authorized by applicable laws and regulations.

The defense challenges the statute as being vague and overly broad and, as applied, interfering with appellant's First Amendment freedom of association and speech.

The Court of Criminal Appeals found that the statute, as applied in this case, is a "reasonable effort to limit impermissible bargaining activities between soldiers and their commanders." 41 MJ at 509. The court noted that appellant was not charged with anything related to the content of the meetings. *Id.* The court also found it "obvious" from the face of the statute that its goal was to prohibit traditional labor relations actions

within the military. *Id.* at 509–10. The court further found that, although there may be some imprecision in the sweep of the statute, "there is no possibility that the appellant was surprised to learn" that it was against the law to conspire to organize a walk out or attempt to see the walk out through to completion. *Id.* at 510.

The court then held that, even if the statute could be applied to constitutionally protected activity, courts have traditionally construed statutes to avoid an overbroad reach. 41 MJ at 510.

## DISCUSSION—ISSUE I

Congress has been vested with the responsibility under Article I, section 8, clause 14, of the Constitution for establishing rules for the regulation of the land and naval forces. The Supreme Court has recognized that Congress, in performing its role in making these regulations, is entitled to deference in its exercise of the "plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline." *Chappell v. Wallace,* 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983). This Court has been sensitive to performing its obligation and ensuring First and Sixth Amendment rights of servicemembers. But we are mindful that

[j]udges are not given the task of running the Army.... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

In *Chappell v. Wallace, supra* at 302, 103 S.Ct. at 2366, citing *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973), the Supreme Court commented: "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the ... con-

trol of a military force are essentially professional military judgments."

### Sixth Amendment—Notice

 The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation[.]" Fairness requires appropriate notice that the act would be criminal. The Due Process Clause of the Fifth Amendment also demands that a statute not be so vague or overbroad that one cannot determine its meaning. *See, e.g., Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Boyett,* 42 M.J. 150 (1995); *United States v. Dear,* 40 MJ 196 (CMA 1994). This is especially true when viewed in light of First Amendment protections.

Similar charges of vagueness and overbreadth were made in *Parker v. Levy, supra* (implicit in *Levy* that Article 133, UCMJ, 10 USC § 933, was not constitutionally infirm because of no intent requirement). There, Captain Howard Levy, a physician training Special Forces aide personnel, had made a number of anti-war statements to patients and enlisted personnel while on duty. Additionally, he had urged servicemembers to refuse to fight in Vietnam. He was charged, *inter alia,* with conduct unbecoming an officer and conduct prejudicial to good order and discipline. The Court of Appeals held that Articles 133 and 134 as applied were unconstitutional. *Levy v. Parker,* 478 F.2d 772, 789–90 (3d Cir.1973). The opinion below suggested that the Articles were overly broad. *Id.* at 794–95.

 The Supreme Court recognized that, in examining a statute under "the vagueness doctrine," there is a requirement of "more precision" when the case involves "regulation of expression." 417 U.S. at 756, 94 S.Ct. at 2561. "Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Id.* at 757, 94 S.Ct. at 2562, citing *United*

*States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954).

Another case involving First Amendment rights and overbreadth is *Avrech v. Secretary of the Navy,* 477 F.2d 1237, 1240 (D.C.Cir.1973), *rev'd,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974). While in Vietnam, Avrech typed up a stencil critical of America's involvement in the war. He requested permission to duplicate his stencil, but his immediate supervisor denied him permission and turned the stencil over to authorities. He was convicted by court-martial of attempting to publish his statement, which was "disloyal to the United States," with the intention of promoting "disloyalty and disaffection among the troops." 477 F.2d at 1239. A Federal District Court rejected his contentions that his conviction was unconstitutional and that Article 134 was overbroad in violation of the First Amendment and vague in violation of the Fifth Amendment.

The Court of Appeals reversed the District Court decision. Retired Supreme Court Justice Tom Clark found it unnecessary to address the overbreadth claim but said that the statute, as applied, was vague. Justice Clark said that the statute was void for vagueness if its wording was so indefinite that a reasonable person would have to guess as to its meaning. Then, applying civilian specificity standards, he found Article 134 void for vagueness. He rejected the government argument that the military cases furnished a saving but narrow construction of Article 134's scope. 477 F.2d at 1241–44.

The Government then sought review in the United States Supreme Court. Over the dissents of three Justices, the Court issued a per curiam decision reversing the Court of Appeals, citing *Parker v. Levy, supra. See Avrech,* 418 U.S. at 678, 94 S.Ct. at 3040.

 Like *Levy* and *Avrech,* there should be little doubt that appellant's organizing *battalion-wide* meetings to discuss living conditions, long hours, and inadequate time off, then arranging for transportation home would be improper. *Cf. United States v. Howe,* 17 USCMA 165, 37 CMR 429 (1967) (upheld 2LT Howe's conviction for conduct

unbecoming an officer by participating in civilian clothes in a public demonstration off post carrying a sign urging "end Johnson's Facist agression [sic] in Vietnam"); *Culver v. Secretary of the Air Force,* 559 F.2d 622, 630 (D.C.Cir.1977) (held service regulation did not violate First Amendment in prohibiting Air Force member from participating in a demonstration in London). In fact, had appellant not been charged under Article 134 with violating 10 USC § 976, but just charged with conduct that was prejudicial to good order and discipline, there would be no question that such an allegation would not be vague or a violation of the Due Process Clause of the Fifth Amendment. Thus, we agree with Chief Judge Cox's separate opinion. An alternative ground for upholding appellant's conviction would be to affirm the conviction for an offense "closely related" to the offense charged. *See, e.g. United States v. Hoskins,* 29 MJ 402, 405 (CMA 1990); *United States v. Epps,* 25 MJ 319, 323 (CMA 1987).

While there might be a few situations in which the statute might be invalidly applied, there are a number of circumstances where it could "be validly applied" without suffering from "overbreadth" which is so "substantial" that it interferes with First Amendment rights. *Levy,* 417 U.S. at 760, 94 S.Ct. at 2563.

*First Amendment—Freedom of Speech and Association*

■ In the civilian community, there are certain categories of speech not protected by the First Amendment: obscenity, *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); fighting words, *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); and dangerous speech, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

■ "Fighting words" are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky, supra* at 572, 62 S.Ct. at 769. In order to be fighting words, the words must constitute a direct personal insult. *Cohen v. California, supra.* Are there fighting words left? In *Buffkins v. City of Omaha,*

*Douglas County, Nebraska,* 922 F.2d 465, 472 (8th Cir.1990), the Court held that calling a police officer an "asshole" was not considered fighting words.

■ The test for dangerous speech in the civilian community is whether speech presents a clear and present danger. "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).

In *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), the Court defined "clear and present danger" as extending to incidents "directed to inciting or producing imminent lawless action ... likely to incite or produce such action."

■ The test in the military is whether the speech interferes with or prevents the orderly accomplishment of the mission or presents a clear danger to loyalty, discipline, mission, or morale of the troops. *See, e.g., United States v. Hartwig,* 39 MJ 125, 128 (CMA 1994); *United States v. Priest,* 21 USCMA 564, 570, 45 CMR 338, 344 (1972). This is a lower standard not requiring "an intent to incite" or an "imminent" danger.

■ There are competing values and interests in a free society. A fundamental right in such a society is freedom of speech and association protected by the First Amendment. The right to express ideas is essential to a democratic government. *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (the Court held that Ohio's requirement of self-identification of campaign literature is an unconstitutional limitation of free speech). Both military servicemembers and civilians have the right to criticize the Government and to express ideas to influence the body politic.

■ But the right of free speech is not absolute. *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441, 77 S.Ct. 1325, 1328,

1 L.Ed.2d 1469 (1957); *see* 405 U.S. LII. There is a difference between the rights of a civilian and the rights of a servicemember. *Cf. United States v. McCreight,* 43 MJ 483, 486 (1996). The same concept was articulated earlier by the Supreme Court in *Levy,* 417 U.S. at 758, 94 S.Ct. at 2563: "The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it."

■ In a democratic society there is competition between security and democracy. These may be balanced, but there are both international and domestic implications to be considered in determining such a balance. To ensure an adequate discussion of the competing interests, servicemembers as well as the public in general have a right to voice their views so long as it does not impact on discipline, morale, esprit de corps, and civilian supremacy. The countervailing government interest in maintaining discipline, morale, esprit de corps, and civilian supremacy has been addressed in the past.

■ *Discipline.* As this Court stated in *Priest,* 21 USCMA at 569–70, 45 CMR at 343–44:

First Amendment rights of civilians and members of the armed forces are not necessarily coextensive, but, in speech cases, our national reluctance to inhibit free expression dictates that the connection between the statements or publications involved and their effect on military discipline be closely examined.

■ The weighing of First Amendment considerations within the military is such that "the right of free speech in the armed services is not unlimited and must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country." *Priest,* 21 USCMA at 570, 45 CMR at 344. In *Levy,* 417 U.S. at 744, 94 S.Ct. at 2556, the Court repeated this observation from *In re Grimley,* 137 U.S. 147, 153, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890): "An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can

be left open as to the right to command in the officer, or the duty of obedience in the soldier." The military may restrict the soldier's right to free speech in peace time because speech may "undermine the effectiveness of response to command." 417 U.S. at 759, 94 S.Ct. at 2563.

In *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) the Supreme Court stated: "[T]o accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."

Because of the hostile environment faced by servicemembers, there must be an instinctive obedience to orders from superiors. This instinct must be internalized to accomplish the military mission of protecting the nation to deter war, and if necessary, to successfully fight wars.

■ The interest in maintaining good order and discipline has few counterparts in the civilian community. Thus, Courts will "not overturn a conviction unless it is clearly apparent that, in the face of a First Amendment claim, the military lacks a legitimate interest in proscribing the defendant's conduct." *Avrech v. Secretary of the Navy,* 520 F.2d 100, 103 (D.C.Cir.1975).

*Military Mission.* In addition to responsiveness to orders and the need for discipline, we will also examine the military mission. As to the mission of the military, Senator Nunn stated:

The primary mission of the armed forces is to defend our national interests by preparing for and, when necessary, waging war, using coercive and lethal force. Responsibility for the awesome machinery of war requires a degree of training, discipline, and unit cohesion that has no parallel in civilian society.

The armed forces must develop traits of character, patterns of behavior, and standards of performance during peacetime in order to ensure the effective application and control of force in combat. Members of the armed forces are subject to disciplinary rules and military orders, twenty-four hours a day, regardless of whether

they are actually performing a military duty.

Military service is a unique calling. It is more than a job. Our nation asks the men and women of the armed forces to make extraordinary sacrifices to provide for the common defense. While civilians remain secure in their homes, with broad freedom to live where and with whom they choose, members of the armed forces may be assigned, involuntarily, to any place in the world, often on short notice, often to places of grave danger, often in the most spartan and primitive conditions.

Nunn, *The Fundamental Principles of the Supreme Court's Jurisprudence in Military Cases*, 29 Wake Forest L.Rev. 557, 558 (1994), *reprinted in The Army Lawyer* 27, 28 (DA PAM 27–50–266) (Jan. 95).

*Civilian supremacy.* The purpose of our military is to defend our national security as well as to project power as a part of our national strategy in international politics. This rationale must recognize the supremacy of civilian authority over military authority. Foreign policy and the projection of force is the function of the Executive and Legislative Branches. The heart of a free society depends upon national security and the ability to project power worldwide. Servicemembers are sworn to protect our national security.

The security of the United States is dependent upon international order. The role the United States plays in international politics will determine the security of the nation, particularly with the shift in distribution of power after the Cold War. There is always a political question as to exactly what extent the United States should use its military force. Because of the political debate over the United States' role in international politics, the supremacy of civilian authority is essential. Continuity of power and the distribution of use of power may determine not only the security interests of the United States but also of many other nations. The imposition of force will depend on motivation, attitudes, and the internal composition of the domestic structure of the United States. In one sense, a nation's security is not only dependent upon its reputation for power, but its willingness to project power to preserve peace. Peace and power are not mutually exclusive but may be considered as part of a continuum.

The military must be subordinate to its civilian superiors. This does not mean that servicemembers may not express their views. However, they do not have an absolute right to express their views. "[F]reedom of expression upon public questions is secured by the First Amendment." The right to freedom of speech "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). In fact "public discussion is a political duty." *Id.* at 270, 84 S.Ct. at 720, quoting *Whitney v. California*, 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). To carry out this duty and exercise this right, there must be freedom to think as you will, to speak as you think. However, this right must be tempered in a military setting based on the mission of the military, the need for obedience of orders, and civilian supremacy.

Article 88, UCMJ, 10 USC § 888, makes it an offense for "[a]ny commissioned officer [to] use[ ] contemptuous words against the President" and other senior officials. One of the rare instances of prosecution under this clause involved an individual who used contemptuous expressions about President Lincoln. Vagts, *Free Speech in the Armed Forces*, 57 Colum.L.Rev. 187, 193 (1957). Likewise, servicemembers may be charged with disrespect towards officers and noncommissioned officers under Articles 89 and 91, UCMJ, 10 USC § 889 and 891, respectively. Whether there is a violation of free speech requires the balancing of the mission of the military, when, where and how the alleged incident took place, and whether there are practical outlets to reinforce democratic values. A corollary to this is that servicemembers do not have an absolute right to freedom of speech and freedom of association in the military.

The importance of the United States' role in the Gulf War cannot be over-emphasized. Had there been a failure of the projection of power, the impact on national security interests could have been dire.

■ While appellant was meeting with soldiers to protest their working and living conditions, other servicemembers were sleeping in the Saudi desert in their tents, in their tanks, in their trucks, and, in some cases, on the sand with only the stars above. Appellant had many outlets for his complaints, The Inspector General, members of the command, the Secretary of the Army (Art. 138, UCMJ, 10 USC § 938), and members of Congress (10 USC § 1034). The statute did not directly regulate free speech which "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Commission*, 514 U.S. at ——, 115 S.Ct. at 1518. Even if we treated this speech as political speech, it was not protected under these circumstances. The talk by appellant did not coincide with the public's need for an effective and informed electorate. Likewise, the interests involved here did not deal with the difficult reconciliation required for the accommodation between political discourse and the right to vote. *Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992). The statute in question did not completely curtail free speech. In fact, where a soldier has grievances, there are various means to air these grievances and complaints specifically set forth in the statute. Art. 138.

Article 138 of the Code provides that a complaint may be made through the chain of command to the service secretary. In addition, all the services have Inspector Generals who could entertain these types of complaints. While Congress sought to limit an outcome in particular cases, there was no strategic manipulation of the ability to inform other servicemembers or the public concerning a certain perspective. The comments of the concurring Justices in *Parker v. Levy*, *supra*, are just as appropriate to this case: "[T]imes have not changed in the area of moral precepts.... The general articles are essential not only to punish patently criminal conduct, but also to foster an orderly and dutiful fighting force.... [U]ndisciplined rank and file can decimate a fighting force." 417 U.S. at 763, 94 S.Ct. at 2565 (Blackmun, J., concurring). This was not only an undisciplined fighting force that appellant was seeking to lead, but also one that was actually going to quit.

The statute here seeks to make it unlawful to organize, strike, or commit "any other similar form of concerted action ... directed against the Government." 10 USC § 976(c)(3). These were not just gripe sessions; rather, they were meetings to assist soldiers in abandoning their units during the largest mobilization since World War II.

In contrast to *Levy*, appellant urged the servicemembers in his unit to abandon their duty and return home.

## FACTS—ISSUE II

A meeting on February 7, 1991, was followed by a mass AWOL of servicemembers from the First Battalion, 156th Infantry Regiment (Mechanized) that left Fort Hood, Texas, as a group and returned to their hometown of Shreveport, Louisiana. Upon returning home, some of the soldiers from that unit complained to the local media. The return home of Shreveport servicemembers followed an earlier incident at Fort Hood in which approximately 15 to 20 Louisiana National Guard troops stopped working for the entire afternoon and refused to obey the Battalion Commander's orders. These three events led the Brigade Commander, Brigadier General (BG) Gary J. Whipple, to appear on local television and condemn the actions of members of his command who had "brought shame on the Brigade ... [and who] didn't represent the people nor the soldiers that were staying and doing their patriotic duty."

As a result of BG Whipple's television appearance, the Staff Judge Advocate, Colonel James D. Mogridge, advised the Fort Polk Commander, Major General (MG) Crouch, that BG Whipple had lost his impartiality. Colonel Mogridge recommended that the Louisiana National Guard cases be transferred "to a Brigade Commander who is not

familiar with the facts." Eventually, Colonel Billy K. Solomon, now Major General Solomon, Commander of Division Support Command, inherited the cases. During the investigation, Colonel Solomon was advised by Colonel Mogridge and two trial counsels appointed for these cases, specifically Captain (CPT) Andra Sparks and CPT Thomas Berg. Colonel Solomon dismissed the initial mutiny charges on the advice from his two trial counsels.

 No motion was made at trial to dismiss the charges or for other appropriate relief based on command influence.

The court below found:

After carefully considering the record of trial, the briefs, and affidavits submitted from the participants, we hold that there was no unlawful command influence in this case that limited the discretion of Brigadier General (BG) Solomon. We note that BG Solomon was not a commander who had been directly involved or personally embarrassed by the incidents. He was advised in the matter by the assigned trial counsel, Captain S, an officer in the office of the staff judge advocate. Significantly, BG Solomon denied that any persons had attempted to influence his disposition decision improperly. Although the facts of the case may have supported a mutiny charge, he was convinced that the charge alleging a violation of Section 976 would more accurately reflect exactly what happened in the incident.

41 MJ at 510 (footnote omitted). We agree.

Colonel Solomon was not influenced or pressured by anyone. No one from the Staff Judge Advocate's Office contacted him as to an appropriate disposition, and Colonel Solomon indicated he had complete independence and control over his jurisdiction.

## DISCUSSION—ISSUE II

 While recognizing that command influence has been a problem for years, *United States v. Weasler*, 43 MJ 15, 16–17 (1995),

this Court has drawn a "distinction between the accusatorial process and the adjudicative stage, that is, the difference between preferral, forwarding, referral, and the adjudicative process, including interference with witnesses, judges, members, and counsel." *Id.* at 17–18 (footnotes omitted). Failure to raise the issue of command influence as to the accusatorial process, as in this case at the trial, waives the issue. *Id.; see also United States v. Hamilton*, 41 MJ 32 (CMA 1994).

The decision of the United States Army Court of Criminal Appeals is affirmed.

Judge WILKINS * concurs.

COX, Chief Judge (concurring in the result):

I do not view this case as a First Amendment case; accordingly I concur in the result.

Article V, American Articles of War of 1775 (enacted June 30, 1775), provided:

Any officer or soldier, who shall begin, excite, cause, or join in any mutiny or sedition, in the regiment, troop, or company ... of the continental forces, either by land or sea, or in any part, post, detachment, or guard, on any pretense whatsoever, shall suffer such punishment, as by a general court-martial shall be ordered.

Quoted from W. Winthrop, Military Law and Precedents 954 (2d ed. 1920 Reprint).

Likewise, 220 years later, Article 94, Uniform Code of Military Justice, 10 USC § 894, proscribes mutiny as a crime against military good order and provides for the death penalty or other such punishment as a court-martial may direct.

Appellant and his confederates clearly, deliberately, and collectively set about to disobey the orders of their superiors and to organize a mutiny against the command and its mission.

Luckily, the Government chose a less sensational and onerous charge upon which to prosecute appellant for his misconduct. Although I find it highly unusual for the Gov-

* Judge William W. Wilkins, Jr., of the United States Court of Appeals for the Fourth Circuit, sitting by designation pursuant to Article 142(f),

Uniform Code of Military Justice, 10 USC § 942(f).

ernment to rely upon a statute (10 USC § 976) outside the Uniform Code of Military Justice but still within the bounds of Title 10, United States Code, for its prosecution of appellant, it is quite clear that appellant's conduct was prejudicial to good order and discipline in the military and punishable as such. Art. 134, UCMJ, 10 USC § 934; *see Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Accordingly, I join in affirming the decision of the Court of Criminal Appeals.

GIERKE, Judge (concurring in part and in the result):

I agree with the majority's resolution of the command-influence issue. It is easy to see why it was not raised at trial: it was patently without merit.

In my view this case is not about protection of "fighting words" under the First Amendment or civilian supremacy over the military. Accordingly, I see no need to agree or disagree with those parts of the majority opinion.

. Similarly, I see no need to address the importance of the Gulf War, the threat of nuclear, chemical, and biological warfare, or the adverse living conditions endured by those who served. There is no issue of "important service" or "hazardous duty" before us.

I reach the same result as the majority on Issue I, but by a different route. I agree with the majority that the statute in question is not overly broad and that it does not violate appellant's First Amendment rights. What the majority fails to address, however, is appellant's argument that *United States v. Pete,* 39 MJ 521 (ACMR 1994), should control this case. *Pete* stands for the proposition that the statute prohibits only "union related" activities. Appellant argues, therefore, that the statute does not apply to the informal action taken by appellant and his comrades.

Both *Pete* and this case were decided by the same panel of the court below, but with different results. Both *Pete* and this case involved "the same episode at Fort Hood with similar charges" against both soldiers. 41 MJ at 508. In *Pete* the court below clearly framed the pivotal issue in both cases:

"[W]hether the appellant's activities were the type of 'concerted action involving members of the armed forces' that the statute proscribes." 39 MJ at 525. The court below construed 10 USC § 976(c) "as proscribing disruptive concerted activity in the military that is indubitably bound with union organizational, representational, or bargaining objectives." *Id.* at 527. The court below found that the Government failed to prove beyond a reasonable doubt that Sergeant Pete's actions violated the statute.

In appellant's case the court below found that appellant and other soldiers "banded together in an informal group that attempted to organize and implement a seven-day-long-'strike' within the military · context for the purpose of forcing a change in their training conditions." The court concluded that appellant's conduct violated the statute. 41 MJ at 509. The court distinguished the *Pete* decision, noting that it "should not be misconstrued to indicate that participation in a 'military labor organization' is a prerequisite for a violation of Section 976(c)(3)(C)." 41 MJ at 508 n. 2. The finding of a violation of the statute in this case is difficult to reconcile with the finding by the very same panel of the court below that Sergeant Pete, a participating member of the same "informal group," did not violate the statute.

At first blush, the literal language of the statute would appear to undermine appellant's argument that his conduct was not proscribed by the statute. The statute makes it—

> unlawful for any person . . . to organize, or attempt to organize, or participate in, any strike, picketing, march, demonstration, or other similar form of concerted action involving members of the armed forces that is directed against the Government of the United States and that is intended to induce any civilian officer or employee, or any member of the armed forces, to . . . make any change with respect to the terms or conditions of service in the armed forces of individual members of the armed forces. . . .

10 USC § 976(c).

The uncertainty arises not from the literal language of the statute, but from the legisla-

tive history reflecting congressional intent. The legislation was enacted in response to efforts by the American Federation of Government Employees (AFGE) to add military personnel to their ranks. House Committee on Armed Services, H.R.Rep. No. 894, 95th Cong., 2d Sess. 6–7 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News (hereafter USCCAN) 7575, 7578. The purpose of the legislation was "to promote the readiness of the Armed Forces by prohibiting the membership of military personnel in military labor organizations, prohibiting the enrollment of military personnel in such organizations and prohibiting the recognition of such unions by members of the Armed Forces or by civilian officers and employees of the Government." House Report, *supra* at 5, reprinted in 1978 USCCAN at 7577.

The statute prohibits organizational and collective bargaining activity by "any person." Appellant would appear to be included in the phrase, "any person." However, in the section-by-section analysis of the House Report, "any person" is followed by the parenthetical "(i.e. a labor organization or association as well as its representatives)," House Report, *supra* at 9, reprinted in 1978 USCCAN at 7581, thus limiting the term "any person" to persons associated with a labor organization or association. Since there was no evidence that appellant was associated with any labor organization, and no evidence that he was trying to form any kind of organization, he would not appear to be included in the term "any person" as that term was intended by Congress. Since criminal statutes must be narrowly construed, I would give appellant the benefit of the ambiguity and hold that appellant's acts did not violate the statute because he was not acting as a representative of any labor organization or association.

Nevertheless, I believe that appellant's conviction of unlawful concerted action can be upheld. Even if appellant does not qualify as "any person" within the meaning of the statute, his conduct was prejudicial to good order and discipline, an included offense under Article 134, Uniform Code of Military Justice, 10 USC § 934. Accordingly, I join the majority in affirming appellant's convic-

tion of violating Article 134, but I would affirm on the basis of a Clause 1 violation instead of a Clause 3 violation. *See* para. 60c, Part IV, Manual for Courts–Martial, United States (1995 ed.). I decline to join the majority's holding that appellant's conduct violated 10 USC § 976(c).

I am satisfied that appellant was not prejudiced on sentencing by the mischaracterization of his conduct as a violation of 10 USC § 976(c). Accordingly, I join the majority in affirming appellant's sentence.

SULLIVAN, Judge (dissenting):

In *The Caine Mutiny* by Herman Wouk, the defense attorney, Lieutenant Greenwald, tells the accused, Lieutenant Maryk, before trial:

> I better tell you one more thing. I'd rather be prosecuting you than defending you. I don't know yet how guilty you are. But you're either a mutineer or one of the dumbest goofs in the whole Navy. There's no third possibility.

*Id.* at 356.

In this case, the Government has come up with that "third possibility"—a violator of an anti-union law. Such a prosecution must fail, however, because there is no evidence of any union activity or union organizing activity in this case.

The words in the name of the statute at issue here give us our initial guidance:

> ***Membership in military unions, organizing of military unions, and recognition of military unions prohibited.***

10 USC § 976. Thus, it is clear that this command statute is directed against anti-union activity. In fact, the clause under which appellant was prosecuted—10 USC § 976(c)(3)—was explained in this light in the "Section-by-Section Analysis" part of House Report No. 894, 95th Cong., 2d Sess., on the basic legislation of the statute (Pub.L. No. 95–610):

> Subsection (c)—*Prohibited union activities.*
>
> This subsection describes the activities which are unlawful for *any person* (i.e. *a*

*labor organization* or association *as well as its representatives),* who is engaged in organizing or collective bargaining activity.

\* \* \*

Subsection (c)(3) *prohibits concerted labor union activities* which are intended to induce a members of the Armed Forces ... to (A) negotiate or bargain concerning the terms or conditions of military service[.]

1978 U.S.Code Cong. & Admin.News at 7581–82 (emphasis added).

The record in this case shows no union activity whatsoever. No dues collecting, union organizing, etc. All we have is a group of griping national guard soldiers called to active duty in a hot, dusty, Texas Army base for some hard training. This group obviously did not like the hard soldiering and felt they were being treated unfairly and harshly. What they wanted to do was to leave the post, go to their home community, expose the harsh training to what they hoped would be a sympathetic media, and then return to duty. This was a dumb idea and an ill-conceived round-trip bus excursion to trouble. It was wrong. In a court of law, a clear-headed prosecution team may well have proved that this was mutiny by refusing to obey orders or perform duties or any of the lesser-included offenses under Article 94, Uniform Code of Military Justice, 10 USC § 894.

Additionally, appellant could not have known that his action of lining up bus transportation for his friends would be viewed as the criminal action of an agent of a labor union. There was no union to be an agent for. Thus, the statute under which appellant was prosecuted is not applicable in the circumstances of this case. Even if the majority, by assuming facts (i.e., existence of a labor union) not in evidence, could apply this statute to this case, application of 10 USC § 976 would be unconstitutionally void for vagueness.

If we were to allow such prosecutions under this statute, who knows how far such a statute could be stretched. Could three soldiers who decide to go off base without a pass for a beer with a reporter to discuss the evil things done by their harsh first sergeant likewise be prosecuted? Clearly, the common sense approach to handle the discipline of appellant would be to use the age old mutiny statute and its list of lesser-included offenses.

Moreover, on leadership grounds but not on legal grounds, I question the command decision to give Article 15, UCMJ, 10 USC § 815, punishment to white soldiers for leaving their post and going home, but giving federal criminal convictions to black soldiers who tried to do the same thing at the same post during the same time period. Let us use common sense and fairness.

For the above legal reasons, I would reverse the decision below and remand it for a possible rehearing under the appropriate statutory provisions.**

---

** *The various opinions of the judges of this Court indicate that there are not three votes for upholding the lower appellate court's decision that the* *military anti-union statute (10 USC § 976) was violated in this case.*