# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 40202**

_____

**UNITED STATES**
*Appellee*

**v.**

**Samuel H. SMITH**
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 5 May 2023

_____

*Military Judge:* Rebecca E. Schmidt (arraignment and pretrial motions); Colin P. Eichenberger (trial).

*Sentence:* Sentence adjudged on 9 July 2021 by GCM convened at Creech Air Force Base, Nevada. Sentence entered by military judge on 30 July 2021: Bad-conduct discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major David L. Bosner, USAF; Major Ryan S. Crnkovich, USAF; Scott Hockenberry, Esquire.

*For Appellee:* Lieutenant Colonel G. Matt Osborn, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, CADOTTE, and ANNEXSTAD, *Appellate Military Judges*.

Senior Judge RICHARDSON delivered the opinion of the court, in which Judge ANNEXSTAD joined. Judge CADOTTE filed a separate opinion, concurring in part and dissenting in part and in the result.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

RICHARDSON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification each of breach of the peace, aggravated assault with a dangerous weapon, and wrongful use of marijuana, and two specifications of communicating a threat, in violation of Articles 116, 128, 112a, and 115, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 916, 928, 912a, 915.[1,2] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. Appellant was credited with 299 days for time served in pretrial confinement. The convening authority took no action on the findings or sentence.

Appellant raises seven issues on appeal: whether (1) the military judge erred by denying a motion to abate due to unavailable surveillance footage; (2) trial counsel committed prosecutorial misconduct throughout the litigation; (3) Appellant's conviction for breach of the peace is legally and factually insufficient; (4) Appellant's conviction for aggravated assault is legally and factually insufficient; (5) Appellant had a constitutional right to a unanimous guilty verdict; (6) relief is appropriate for improper contact between witnesses; and (7) Appellant's Rule for Courts-Martial (R.C.M.) 707 speedy trial rights were violated and, relatedly, the record is insufficiently complete to analyze this issue.[3] We have carefully considered issues (5), (6), and (7) and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find error and provide relief for issue (4) by affirming a lesser-included offense and a reassessed sentence, and we affirm the remaining findings.

## I. BACKGROUND

Appellant was assigned to the 22d Attack Squadron at Creech Air Force Base, near Las Vegas, Nevada. On 11 January 2020, Appellant's friend AL returned to the Las Vegas area from a deployment. Appellant met AL at a storage unit, where AL put belongings in Appellant's car, and the two drove off to have drinks with Appellant's friends. After drinks, Appellant drove with AL to a gas

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The members found Appellant not guilty of one specification of reckless driving and two other specifications of communicating a threat, charged as violations of Article 113 and 115, UCMJ, 10 U.S.C. §§ 913, 915.

[3] Appellant personally raises issues (6) and (7) pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982).

station-*cum*-convenience store known as AM/PM in Moapa, Nevada. AL stayed in the car at the gas pumps while Appellant went inside the store. AL spent much of the time at the gas station talking to his girlfriend on his phone via FaceTime.

As Appellant entered the store, a store employee, AB, was exiting to start a break. She forewarned Appellant that the cashier could not sell him cigarettes, but that she could. AB's mother and AB's brother and his then-fiancée arrived at the gas station, and met up with AB outside the store. A regular customer of the store, a young man called MJ, also arrived. When it was his turn at the counter, Appellant wanted to buy cigarettes, so the cashier left the store to ask AB to return. Apparently displeased with the customer service, Appellant complained to AB after she returned to the store. MJ intervened, and referring to AB said to Appellant something like, "Man, don't talk to her like that, she is just doing her job. She is doing a damn good job," to which Appellant responded, "Stay out of this, man, you don't want to get hurt." As Appellant continued to complain about AB's unprofessionalism, AB became less polite to him.

Appellant left the store and returned to his car. AB and her family left the store shortly thereafter. Appellant drove away but circled back to the store. He parked parallel to the entrance where AB was standing. A customer, PF, walking from the pumps to the store testified about what he observed when Appellant circled back:

> As I walked into the store, [Appellant] pulled in front of the store. I walked behind his car to go — he was basically parked right in front of the doors of the convenience store, so I went — I walked at an angle to go into the store. As I passed the car, he was having an argument with some people outside the store. I look over into his car, and that is when he raised up the firearm, out of the seat.
>
> . . . .
>
> The [words of the argument] were at a high volume. [Appellant] was still upset. The people in front of the store were upset at him. He was upset at the people in the store. It was a joint cursing conversation that was going on. And that's obviously what drew my attention is when he started yelling out the window of the car. I drew my attention over to him, and that is when I [saw] the gun come up out of the seat.

AB gave her perspective of her interaction with Appellant:

> He pulled up to me parallel, and at this point, I had never even gave him a second thought. So when he pulls up parallel to the

store to me and he yells, hey tell that pretty boy in there, he needs to watch his ass. There are some hard hitting guys in the street. I kind of chuckled at him told him to leave my store and not come back, and at this point, the defendant pulls out a gun and tries to point it to me and the passenger in the vehicle like kind of like grabs his arm and was like what the hell are you doing?

His exact words if I may, "Tell that pretty boy mother f[**]ker in there he needs to watch his ass, there are some hard hitting guys in the streets." At that time, I chuckled at him and told him to get the f[**]k out of my parking lot and that's when he pulled the gun up and then fricking, the passenger, or whoever he is, pushed the gun down and he sped off.

In cross-examination, AL agreed with Appellant's civilian defense counsel (Civ DC) that "the yelling got to the point where [AL] told [Appellant], 'Dude, get in the car and let's get out of here, man.'" During his testimony, AL confirmed he noticed Appellant roll the passenger window down, heard Appellant yelling and cursing, saw Appellant take out a firearm, and pushed down Appellant's wrist with the firearm. Accounts of where the gun was pointed before AL intervened ranged from down, straight ahead, to up, but generally in AB's direction. The words, "tell that pretty boy in there that there are some hard hitting people in these streets, and he better watch his back" were the basis for the specification alleging a breach of the peace. Brandishing the firearm was the basis for the specification alleging aggravated assault.

AB immediately went into the store to report the incident first by calling 911. She hung up, then instead called the owner of the gas station, BL. Presumably called by BL, Las Vegas Metropolitan Police Department (Metro) officers arrived to the store shortly thereafter.

The gas station was equipped with video and audio recording capabilities. At the time of the incidents, the camera facing the pumps was not operating, but other equipment captured some video and audio around the time of the incidents in question. BL reviewed the footage on her iPad, focusing on Appellant, and saved that search. Metro officers responded and reviewed some of the store's footage with BL. The officers did not copy or request she preserve it. The footage was automatically deleted after several days, and before Air Force authorities learned of the incident.

The next day, 12 January 2020, Appellant called the gas station. CM answered the call. CM testified that Appellant "was talking about an incident that [she] had no idea about." The first thing Appellant asked was whether AB was working. After CM said she could not provide that information, Appellant

asked when AB was scheduled to work next. After CM rebuffed him again, Appellant called CM a "stupid bitch" for not knowing what was going on, and used the same phrase to describe AB. Appellant also said "[they] better watch [their] backs." These words formed the bases for the specifications alleging threats against AB and CM. CM hung up and called BL. CM testified that BL then told her what happened the night before. As a result of this phone call, CM became "more vigilant about everything" and was indeed "watching [her] back." CM noted the caller's phone number using a caller ID feature. A Metro detective traced the number to Appellant.

A few days later, Metro officers executed a search warrant on Appellant's vehicle and home. They discovered one handgun in Appellant's car and another in his home, both loaded. Bodycam footage captured their interactions with Appellant after they apprehended him. Appellant was not fully cooperative; for example, after telling officers to contact AL, Appellant asked Appellant's girlfriend not to provide the officers with AL's contact information. Appellant denied he "pulled a gun" at the gas station. Instead, he implicated "that lady and her son" and said "her son tried to assault" him.[4] Appellant told the officer what he said to bystanders at the gas station:

> I just told them I said, hey, you tell that lady and her son in there that they shouldn't be treating people like that. I said because — her son just came out of high school, the way he looked like to me. You know, I'm like, don't be doing that, some bad dudes would probably just drop him right there, you know. And I'm sitting there and I'm talking to them and I'm like, you know, there's some bad dudes that would probably just drop him right there. And my buddy's like, let's just go. And I'm like all right. And then we left.

On or about 17 September 2020, soon after AL made a statement under immunity implicating Appellant, Appellant was ordered into pretrial confinement. As part of that process, his urine was collected and medically screened, and tested positive for a metabolite of marijuana. On 25 September 2020, Appellant's urine was again collected and forensically tested, and was tested positive for a metabolite of marijuana. This second urinalysis formed the basis for the specification alleging wrongful use of marijuana.

---

[4] The record does not indicate that AB had a son. Appellant may have been referring to MJ.

## II. Discussion

### A. Motion to Abate – Recordings Regarding Communicating a Threat

Appellant asserts the military judge erred by denying a pretrial defense motion to abate the proceedings on the basis that audio and video recordings from the convenience store were not preserved. On appeal, Appellant addresses only the recordings relating to his conviction for communicating a threat when he called the store on 12 January 2020 and spoke to CM on the phone. We conclude the military judge did not err, and no remedy is warranted.

#### 1. Law

On a defense motion to abate, the defense bears the burden of persuasion on factual issues necessary to decide the motion. *See* R.C.M. 905(c)(2)(A). To prevail on a motion to abate based on lost or destroyed evidence, the defense must show: (1) the evidence is of such central importance to an issue that it is essential to a fair trial; (2) there is no adequate substitute for the evidence; and (3) the defense was not at fault for the evidence being destroyed. R.C.M. 703(e)(2); *United States v. Simmermacher*, 74 M.J. 196, 201 n.5 (C.A.A.F. 2015). Unlike the analysis under the Due Process Clause of the Constitution,[5] a violation of R.C.M. 703(e)(2) may be found even when there is no bad faith on the part of government officials. *See Simmermacher*, 74 M.J. at 199.

"A military judge's failure to abate proceedings is reviewed for an abuse of discretion." *Id.* (citation omitted). "An abuse of discretion occurs when a court's findings of fact are clearly erroneous or the decision is influenced by an erroneous view of the law." *Id.* (citation omitted). An abuse of discretion can also occur when a military judge "applies correct legal principles to the facts in a way that is clearly unreasonable" or "fails to consider important facts." *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (citations omitted).

#### 2. Analysis

Appellant asserts "the military judge made two erroneous legal conclusions: (1) finding that the lost footage was not 'of central importance to a fair trial' and (2) finding 'the Defense has not established how the testimony of CM [the cashier] and BL [the gas station owner] are not adequate substitutes to describe CM's portion of the conversation.'" Appellant does not claim the military judge made any findings of fact that are clearly erroneous, or that the military judge misunderstood the law.

Appellant claims "[i]t is clearly unreasonable to find that video and audio recordings *of charged events* is not of central importance to a fair trial." How-

---

[5] U.S. Const. amend. XIV.

ever, the "charged events" are the words Appellant allegedly used to communicate with CM, which were not captured in the recording at issue. The military judge did not abuse her discretion in making the following conclusions in her ruling:

> [T]here is no evidence that any audio or video recording of CM's 12 January 2020 conversation with [Appellant] would include his statements. The evidence establishes that only CM's portion of the conversation taking place in the convenience store would be recorded. As a result, this evidence would not directly relate to the [Appellant's] alleged statements in violation of Article 115[, UCMJ]. The Defense has not articulated or demonstrated with evidence how CM's statements during this conversation are of central importance or essential to a fair trial.

Appellant also claims the military judge failed to consider three important facts:

> (1) Ms. CM's physical and verbal responses would be indicative of Appellant's words on the other end of the line; [ ] (2) Ms. CM's credibility about these very events was already at issue (so much so the [G]overnment felt obligated to provide [ ] notice), in that she had lied to the [G]overnment about foreknowledge of the previous day's events at the time of the charged phone call[;] and (3) that Appellant's personal efforts to secure the complete security footage was strong evidence that the contents would be exculpatory.

We do not agree these were important facts that the military judge failed to consider. The military judge found the "[v]ideo and audio recordings on CM's portion of her conversation with [Appellant] on 12 January 2020 would be relevant and non-cumulative." She also found that "[w]hile the Defense has identified a potential discrepancy between CM's perception of the length of this call and BL's review of the recordings, this discrepancy may be developed through available evidence and is not of central importance in this court-martial." The Defense did not establish that CM having "foreknowledge of the previous day's events" would be shown by a recording. The military judge adopted as fact paragraph 21 of the Defense motion, which she repeated almost verbatim: "The parties agree that the first time anyone attempted to obtain a copy of the audio and video recordings from the Arco AM/PM store was when an investigator working on behalf of [Appellant] served a subpoena on the Arco AM/PM store for a copy of the recordings." That the military judge gave these facts less weight than Appellant would is not justification for finding an abuse of discretion in this case.

Appellant next claims that "it was error to conclude that testimony of the gas station personnel provided an adequate substitute for the unavailable evidence." In support, Appellant again claims the recording captured the "charged event" for which "there is no adequate substitute," and again—like the military judge—we reject that claim. The recording would not have contained Appellant's words, and testimony from witnesses about the phone call was available. Appellant also argues "the relevance of the lost evidence was that it would have been used to challenge the credibility of the gas station personnel's testimony." That is, CM was both the witness to the call and the witness whose credibility the Defense wanted to challenge, making her testimony about the call an inadequate substitute. This argument is unconvincing. Whether the recordings would have shown some reason to question CM's credibility is speculative. Moreover, the Defense had evidence available that would call into question CM's credibility, including records indicating the length of the phone call and BL's conversations with CM about the events involving AB.

We conclude the military judge did not abuse her discretion in denying the defense motion to abate the proceedings based on the loss or destruction of audio or video recordings from 12 January 2020.

## B. Trial Counsels' Opening Statement and Findings Argument

Appellant alleges trial counsel made several improper comments during the Government's opening statement and findings argument. He asks us to set aside the findings and sentence as a remedy. We find relief is not warranted.

### 1. Law

We review claims of prosecutorial misconduct de novo. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017). "Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88).

When a proper objection to a prosecutor's comment is made at trial, we review the comment for prejudicial error and consider whether the military judge's ruling on the objection constituted an abuse of discretion. *See Fletcher*, 62 M.J. at 179; *Sewell*, 76 M.J. at 18 (citing *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014)). "When a party does not object to comments by the prosecutor during voir dire, opening statement, argument on the findings, or

argument on the sentence, we review for plain error." *United States v. Palacios Cueto*, 82 M.J. 323, 333 (C.A.A.F. 2022) (citations omitted).

> Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Thus, we must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

*United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (internal quotation marks and citations omitted). "[T]he best approach for assessing the prejudice from prosecutorial misconduct 'involves a balancing of three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Palacios Cueto*, 82 M.J. at 334 *(*quoting *Fletcher*, 62 M.J. at 184). The burden to establish plain error, including prejudice, is on the appellant. *Id*.

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *Sewell*, 76 M.J. at 18 (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001). We do not "'surgically carve' out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238.

Reversal based on prosecutorial misconduct "is warranted only 'when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *Sewell*, 76 M.J. at 18 (quoting *Hornback*, 73 M.J. at 160). In assessing the impact of a prosecutor's improper comments on an appellant's substantial rights in the absence of an objection, we ask whether the outcome would have been different without the error. *See United States v. Norwood*, 81 M.J. 12, 19–20 (C.A.A.F. 2021). "[T]he lack of a defense objection is 'some measure of the minimal impact' of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

**2. Analysis**

***a. "Walk Away" and Character Evidence***

Appellant asserts the Government's theme that Appellant could or should have "walked away" instead of engaging in the charged misconduct "suggest[ed] to the panel that Appellant had a general criminal disposition." Appellant asserts the Government's reference to the number of alleged offenses, moreover, "invited the members to conclude that Appellant must be guilty of the charged conduct because there was so much charged conduct." Relatedly, Appellant claims that trial counsel's findings argument that evidence supporting one offense also supported another offense was improper spillover. We address this latter contention first, after providing excerpts of the Prosecution's opening statement and findings argument.

Assistant trial counsel (ATC) began the Government's opening statement as follows:

> Members, all that [Appellant] ever really needed to do was walk away. But instead, he pulled a gun on a gas station clerk who hadn't sold him cigarettes fast enough. And that's only one of the many issues that we have to consider here. On the sheet in front of you there is alleged misconduct dating as far back as August of 2019 straight through September of 2020. There's a lot on there. So, I'm going to take a second, go through it, talk about each issue and establish some of what you can expect to see here. So, let's start at that gas station.

After describing what the evidence would show in relation to the gas station, and apparently referring to Appellate Exhibit LIII—the flyer reflecting the specifications—ATC said, "There is a lot more on there. So, let's roll back to the very first thing." He moved on to the specification alleging a threat occurring five months before the gas station incidents. ATC ended the Government's opening statement as follows:

> Remember at the beginning, all he had to do is just walk away, just let it go. Every incident, every time, there is a commonality. Remember, for every choice he made, there is a version of that story where he just walks away from whatever situation he has put himself in. He should have walked away. Thank you.

The Defense did not object during the Government's opening statement.

Trial counsel (TC) began the Government's closing argument as follows:

> He could have walked away. He should have walked away; but he didn't. What we have seen here today, is witness, after witness, after witness coming before this court, taking an oath and

> testifying and telling us how over the course of a year, when [Appellant] came across somebody who didn't do what he wanted, he couldn't take it.

Civilian defense counsel objected based on "improper character evidence." The military judge sustained the objection, and told the court members to "disregard that last portion of trial counsel's argument." Trial counsel continued to use the theme from opening statement—that Appellant could have walked away or otherwise deescalated the situations instead of committing the charged misconduct. The Defense did not object again during closing argument.

TC argued the evidence from which the members could infer Appellant's intent to commit bodily harm upon AB that was required for aggravated assault. He started by inferring Appellant's frame of mind during the charged offense. He continued:

> But I urge you that you don't have to look at just the circumstances of that day, look at the circumstances of the next day. Look at how [Appellant] kept that in his mind. Look at how it kept growing. Look at how he couldn't stop thinking about it and he sat on his phone and he looked up that gas station's phone number.
>
> . . . .
>
> [Appellant] knew when [AB] was going to be there, he could go back. And if he went back, [AL] wouldn't be there this time. There would be no one in the passenger seat pushing his arm down. You can see that intent to do bodily harm to [AB] manifest itself the next day because he still couldn't get it out of his mind. He still had the intent to do bodily harm to [AB]. You can look at those circumstances and you can know beyond a reasonable doubt that [Appellant] intended to do bodily harm to [AB] as he lifted that firearm up in f[u]ry and started moving it towards that window. You can look at those circumstances.

Regarding this portion of TC's argument, Appellant asserts "trial counsel made spillover argument between charged offenses when he urged the panel to consider evidence of one charged offense (communication of threats on 12 January 2020) as evidence of another charged offense (aggravated assault and breach of peace on 11 January 2020)." We disagree. TC argued that the evidence that Appellant called the gas station asking for AB was relevant to determine Appellant's intent with respect to AB the day before. Evidence which is relevant to more than one offense may be considered with respect to each offense to which it is relevant. *See United States v. Henry*, 46 M.J. 595, 607–08

(C.A.A.F. 2017). We find TC argued just that, and did not suggest the members infer or presume guilt. We find this argument by TC was not improper spillover.

Next we consider Appellant's claims that TC impermissibly argued propensity and general criminal disposition. It seems to us that TC's point—delivered with calculated repetition—that Appellant could or should have walked away from situations was more apt for sentencing than findings. Nonetheless, we find no prejudicial error. We also find no prejudicial error in the Government's acknowledgment that Appellant was accused of myriad crimes. For purposes of our analysis, we presume error inasmuch as the Prosecution's comments could be read to convey that Appellant had a general criminal disposition, or that because he committed one crime, he did—or was more likely to—commit another crime.

In our consideration of prejudice, we first note the magnitude of the alleged errors was not severe. The Prosecution did not make any comment that clearly urged an improper consideration of evidence. Next, Appellant did not object to any comments in the Government's opening statement, and the one objection to the Government's closing argument was sustained and adequately remedied with an instruction to disregard that portion of the argument. Finally, we find the strength of the Government's case was mixed, but was not so weak that the Prosecutor's presumably erroneous comments improperly tipped the scales towards conviction. On balance, we are confident the outcome of Appellant's trial would not have been different but for these presumed errors. *See Norwood*, 81 M.J. at 20.

### b. Pretrial Confinement Urinalyses

Appellant claims ATC's mention in opening statement about Appellant's pretrial confinement "invaded Appellant's province of innocence in the court-martial."

ATC concluded opening statement first by describing the specification alleging reckless driving on 21 August 2020, then turned to the specification alleging wrongful marijuana use. He explained:

> It's one thing after another, after another. And in September of 2020, the decision is made that [Appellant has] got to go into pretrial confinement. He's in pre-trial confinement for nine days before they do a standard drug test. The sample is taken nine days in. It comes back positive. Over four times the DoD cutoff for marijuana.
>
> Remember at the beginning, all he had to do is just walk away, just let it go. Every incident, every time, there is a commonality. Remember, for every choice he made, there is a version of that

> story where he just walks away from whatever situation he has put himself in. He should have walked away. Thank you.

In a subsequent Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, Civ DC requested a mistrial. He averred that "the [G]overnment disclosed and told us this morning that they were not going to introduce that [Appellant] was placed in pre-trial [confinement], and that they were not going to introduce a second urinalysis was taken." The circuit trial counsel (CTC) agreed he had told trial defense counsel they would not raise Appellant's pre-trial confinement, and that he did not communicate that to ATC. CTC also stated they intended to raise the second urinalysis that was performed in relation to Appellant's pre-trial confinement, and not the first "initial positive screen." Moreover, even though the observer for that second urinalysis collection was a confinement officer, the Government did not intend to disclose to the trier of fact that Appellant was in pretrial confinement. In support of his request for a mistrial, Civ DC argued "this is manifestly unjust" because it was "innuendo" that the Appellant's squadron commander was so scared after the reckless-driving incident that he placed Appellant into pretrial confinement, where Appellant tested positive on the medical screen for drugs.[6]

The military judge denied the defense motion for a mistrial, and found "that an appropriate curative instruction is sufficient to remedy any error caused by trial counsel's reference to pre-trial confinement during their opening statement." The military judge also found "that trial counsel's reference to pre-trial confinement was improper and requires a remedy" in the form of an instruction. The military judge stated:

> I also want to address with trial counsel. At this point, the court finds any reference to pre-trial confinement to be inappropriate. The court thinks that — finds that making a reference to pre-trial confinement does carry with it the possibility of unfair prejudice to the accused. Before any reference is made to that matter moving forward, counsel must request an Article 39(a) session so that can be taken up outside the presence of the members. If you believe any door has been opened that makes that matter somehow now admissible, a specific reference to pre-trial confinement, you need to take that up outside the presence of the members first, and get a ruling from this court on the admissibility of that evidence.

---

[6] Appellant was placed into pretrial confinement almost a month after the alleged reckless driving incident.

Without objection from the parties, the military judge provided the members a curative instruction, that included an admonition to "completely disregard the portion of the trial counsel's opening statement that made reference to pre-trial confinement." The members confirmed they were able to follow that instruction.

The Government got through its examinations of the confinement officer and its expert toxicologist without a mention that Appellant had been in pretrial confinement. During cross-examination of the toxicologist, however, Civ DC brought up the initial screen of urine collected around 17 September 2020 that was positive for a metabolite of marijuana:

> Q. Right, but the point here being is that one could reasonably expect that if there was a medical screening at 312 nanograms [per milliliter of urine], that should have been completely eliminated from his system on the 25th, should it not?
>
> A. Yes, sir.
>
> Q. So, if he went into pretrial, because let's just stop dancing around it, right? Stop dancing around it, he went in there, and they did a medical screening and it came back at 312, that screening on the 25th should have been negative, under the DoD cut off? Right?
>
> A. Run that by me again, sir.
>
> Q. If he was at 312 on the medical screen.
>
> A. Yes.
>
> Q. On or about the 17th, by the 25th that test should have been negative?
>
> A. If it reflected a single use, I would agree with that.

In a subsequent Article 39(a), UCMJ, session, CTC requested the military judge reconsider his ruling and allow the Government to present evidence that Appellant had been in pretrial confinement. Civ DC responded that he had "no objection to it, for the limited purpose of showing the medical screening" and that he had "clearly made the strategic and tactical decision that the value of that test outweighs . . . any other uses."[7]  Thereafter, the Defense did not request any instruction to the members on the matter. In closing argument, Civ

---

[7] CTC also requested to elicit more detail about the initial screen urinalysis, to which the Defense had no objection and which request the military judge granted. Finally, CTC requested to explore whether the urinalysis results could indicate a habitual user

DC told the members why he raised Appellant's pretrial confinement: "Now, I want to talk about the drug charge. Why do I . . . tell you about the pretrial confinement? Because that test you have in front of you should be zero nano-grams per millimeter of THC."

The military judge instructed the members, *inter alia*, that the "law presumes the accused to be innocent of the charges against him" and an "accused may be convicted based only on evidence before the court not on evidence of a general criminal disposition."

For the first time on appeal Appellant claims,

> The panel was informed that Appellant was a pretrial inmate, suggesting the command found Appellant's pretrial conduct so serious—and to a certain extent, substantiated—that he could not be trusted in larger society. That notion invaded Appellant's province of innocence in the court-martial. The constitutional innocence with which Appellant should have walked into that courtroom was, at the very least, shaded in curious doubt as to what Appellant had done wrong prior to trial, such that he was ordered into and to remain in pretrial detention.

Presuming error in ATC's opening statement, we conclude the military judge satisfactorily addressed that error with a curative instruction, and Appellant was not prejudiced by the error. Appellant cites no blanket prohibition on mention of an accused's pretrial confinement during trial. It appears that in this case, counsel made a gentlemen's agreement that Appellant's pretrial confinement would not be raised, even though that fact was intertwined with the Government's urinalysis evidence. The Government conceded error, explaining that ATC did not know about that agreement, and the military judge remedied that error with an instruction. The military judge forecasted to counsel that if the Government wanted to elicit evidence of Appellant's pretrial confinement, it should make a request to allow the military judge to conduct a Mil. R. Evid. 403 analysis. Before that happened, however, Appellant's trial civilian defense counsel chose to "stop dancing around it" and used the fact of Appellant's pretrial confinement to question the Government's toxicologist. Afterwards, the Government made the requisite request to the military judge to elicit evidence of Appellant's pretrial confinement. The Defense stated it did not object, and the military judge granted the Government's request.

The record does not support Appellant's contention that ATC questioned the presumption of Appellant's innocence in her opening statement. In context,

---

of marijuana; the military judge allowed this line of inquiry over the Defense's objection.

ATC mentioned Appellant's pretrial confinement in anticipation of evidence that would show that Appellant's urine still tested positive for a metabolite of marijuana nine days after his access to illegal drugs was severely restricted. She made no comment about how, when, or why Appellant was entered into pretrial confinement, or that any adverse inference should be drawn from that entry. She also did not address if or when Appellant was released from pretrial confinement.

We find the alleged error was not of a constitutional dimension, and specifically did not jeopardize Appellant's presumption of innocence. Appellant suffered no material prejudice to a substantial right as a result of ATC's comment in opening statement.

### c. Vouch for Evidence

Appellant claims that trial counsel's use of the word "we" during findings argument should be construed as impermissibly vouching for evidence. Appellant refers to several instances, including the part of the argument beginning after trial counsel referenced the military judge's instruction on the Government's burden of proof beyond a reasonable doubt:

> *Now, throughout this trial, we have heard overwhelming evidence that leaves no choice but to be firmly convinced that [Appellant] committed all of the charged offenses.* And as you evaluate that evidence in this case, I'm going to ask you to consider what the military judge told you about weighing credibility of witnesses, we heard from many of them. And you have a duty to evaluate their credibility, their believability.

In addition to the pronoun "we," Appellant claims trial counsel vouched for evidence during this part of findings argument:

> And even though we're here at trial more than a year after some of these incidents occurred, you have heard witnesses testify under oath as to what they remember. And as to the substantive facts of each case, of each charge, they're not inconsistent, they do remember. And they told you that under oath. *Their sincerity and their conduct in court, ladies and gentlemen, you heard the witnesses go up there, take the stand, some of them were nervous to be here, some of them were scared to be on a military installation, but every one of them was transparent with you. Every one of them did their absolute best on the stand to tell you exactly what they remember.* They were honest when they didn't remember things. They would tell you, I didn't remember this. *There were no witnesses up on the stand trying to hide the ball.* You saw

it in their sincerity. You saw it in how they behaved themselves on the stand.

It is improper for a trial counsel to make "personal assurances" about witnesses or evidence. *Fletcher*, 62 M.J. at 180. Examples are "improper vouching," which "can include the use of personal pronouns in connection with assertions that a witness was correct or to be believed," and "[i]mproper interjection of the prosecutor's views," which can "include substantive commentary on the truth or falsity of testimony or evidence." *Id.* (internal quotation marks omitted) (citation omitted). "'An attorney's statements that indicate his opinion or knowledge of the case are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence.'" *United States v. Causey*, 82 M.J. 574, 582 (N.M. Ct. Crim. App. 2022) (quoting *United States v. Scilluffo*, No. ACM 39539, 2020 CCA LEXIS 62, *62–63 (A.F. Ct. Crim. App. 4 Mar. 2020) (unpub. op.) (additional citations omitted)).

To be sure, a prosecutor commits error when using "we know" or "we have heard" to mean the prosecution or the Government knows something outside the body of evidence. *See Fletcher*, 62 M.J. at 180 (noting improper vouching by trial counsel includes using personal assurances to place "the prestige of the Government behind a witness"). Such is not necessarily the case when the prosecutor uses "we" collectively, as in "all of us in this room." But use of "we know" and "we have heard" carries the risk that the members will not appreciate the distinction. From our review of the record in this case, we conclude the various "we know" and "we have heard" comments were used to reference matters in evidence and how the members should consider such evidence in light of the military judge's instructions. Thus, we find no prejudicial error.

### d. "Misdirection" and Malign Defense Counsel

Appellant asserts that in findings argument, "[TC] launched into a prolonged, apparently pre-drafted attack on the defense counsel, comparing him to a 'magician' that [ ] plays tricks for the purpose of 'deceiving you'" and implied "defense counsel should not be trusted."

After explaining how magicians use misdirection to successfully perform tricks, trial counsel stated:

And in this case, we've seen two types of misdirection from the defense counsel as he has introduced evidence, through cross-examination and questioning witnesses, and even in his own

17

opening statement.[8] The first time is making claims that simply just aren't true. Stating facts or asking questions of witnesses that are facts that are simply contradicted by all the rest of the evidence, contradicted by several witnesses' testimony, contradicted by the video –

At this point, the military judge *sua sponte* interrupted and told TC to "move on." He then told the members, "It's not proper for counsel, for either side, to impugn the credibility of the other counsel. Your decisions in this case should be based solely on the evidence that's presented [and] not your opinion of quality or character of counsel. Please disregard this portion of the trial counsel's argument." Soon thereafter, TC laid out an outline for his argument, ending, "Finally, we're going to talk about how we know that those other facts, from the Defense, that were brought up and the other arguments are incorrect." TC returned to the concept of "misdirection," but did not directly implicate defense counsel.

> Nobody is chasing him out of the store. Nobody is threatening him, nobody. So that's another false allegation that we heard today. But the other kind of thing that we heard today was a lot of irrelevant information that distracts from the actual facts in this case. We heard, for example, character assassinations on everybody involved. We have attacks on [AL], about his testimonial immunity, which as we know had nothing to do with the case of — with his other disciplinary issue compared to this case.
>
> We heard attacks, in the opening statement, on [AB] that for some reason she was going to be on drugs or who knows what kind of substance she's on. There's no evidence of that. But another character assassination on [AB] on top of an allegation that we know is false, that she slapped his hand somehow.
>
> But those aren't the only people who were attacked. They attacked [AB's brother], gave him some insulting nickname, and brought up the fact that hey, he's been in prison.
>
> . . . .
>
> And finally, on top of attacking people, you know, the defense in their opening statement started attacking Las Vegas Metro Police Department and the detectives there. And saying that he

---

[8] In opening statement, Civ DC stated, "Now, [AB] may very well come in here. She will talk at a very high rate of speed, okay. And it is unclear what medications, or illegal substances she may very well be on, but she will have her own credibility issues associated with her."

had used a hold used on George Floyd or something like that, there was no evidence that there was any injury to [Appellant's] neck.

After the Government's initial findings argument, the military judge told counsel his intent to provide the members some curative instructions. When asked whether "[c]ounsel for either side object[s] to those instructions or request[s] any additional corrective measures," trial defense counsel replied, "No objection." Civ DC addressed the concept of "misdirection" in his closing argument: "Now, the [G]overnment talks about misdirection and that is a perfectly fine thread for them to go down in their closing argument, but at the end of the day the burden of proof is on the [G]overnment."

After the Defense's findings argument, and the Government's rebuttal, the military judge provided curative instructions to the members, specifically:

I want to remind you that the opening [statements] and closing arguments of counsel are not evidence. Counsel are not witnesses. If the facts presented in court, as you remember them, differ from the way that counsel stated the facts, either in their opening statements or closing arguments, it is your memory of the facts that were actually presented in court that controls.

To the extent that counsel's argument may have [m]aligned [the] motives of their opposing counsel in their case presentation or otherwise, those portions of their argument should be completely disregarded.

Finally, to the extent that any of counsel's arguments personally vouch for any witness's credibility that portion of their argument mu[st] also be complete[ly] disregarded.

Citing *Voorhees*, 79 M.J. at 10, Appellant claims trial counsel's arguments about misdirection "ran the risk of turning the trial into a 'popularity contest' such that preference for counsel overtook or overshadowed the objective weighing of evidence against [A]ppellant, and instead, deciding the case based upon which counsel the panel preferred." Appellant does not assert the outcome of his court-martial would have been different but for trial counsel's arguments.

When TC accused Civ DC of "misdirection," Appellant did not object. The military judge, however, recognized error and intervened. He instructed the members that their "decisions in this case should be based solely on the evidence that's presented [and] not [their] opinion of quality or character of counsel." Thereafter, TC did not specifically state that it was "defense counsel" personally who misdirected or made untrue claims. TC used passive voice (e.g., "I want to talk about some of the things, the false things, that were brought up in this case") or nonattribution (e.g., "But the other kind of thing that we heard

19

today was a lot of irrelevant information that distracts from the actual facts in this case"). Although trial counsel did not refer to defense counsel personally, it is clear from the argument that he was crediting trial defense counsel with eliciting the "false allegation" or "irrelevant information." Whether this was plain or obvious error is a close call.

Trial counsel then contrasted that with "the actual facts in this case," which statement could be considered a "personal view[ ] on the evidence." *See Fletcher*, 62 M.J at 180. It also could be a permissible argument about what factual matters are in evidence and what are not (e.g., matters posed in a question which the witness did not adopt), or what weight to give the evidence. Trial counsel appeared to provide at least one personal view on the evidence, stating, "But another character assassination on [AB] on top of an allegation that *we know is false*, that she slapped his hand somehow." (Emphasis added).

Assuming clear error, we apply the *Fletcher* factors to consider prejudice to Appellant. *See Palacias Cueto*, 82 M.J. at 334. Trial counsel's comparison of Civ DC to a magician who uses misdirection, implying Civ DC presented falsities, and accusing Civ DC of unduly attacking witnesses was not very severe. In fact, Civ DC told the members it was "perfectly fine" for the prosecutor to have used the "misdirection" theme. Next, Civ DC either did not believe trial counsel's argument was erroneous, or chose not to object. "[D]efense counsel's failure to object to any of the prosecutorial misconduct is 'some measure of the minimal impact of [the] prosecutor's improper argument.'" *Voorhees*, 79 M.J. at 13 (quoting *Gilley*, 56 M.J. at 123). In direct response to the TC's arguments, the military judge *sua sponte* provided the members curative instructions; Civ DC did not object to the instructions or request any other curative measures. The mixed findings indicate the members did not decide the issues merely in line with a "popularity contest" between counsel, as Appellant suggests. While most of the comments were in context of events the first day at the gas station—and Appellant was convicted of those specifications—the evidence of Appellant's guilt was strong. We find Appellant has not shown a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *See Norwood*, 81 M.J. at 20.

### e. Comment on Video Footage

Appellant claims that "[t]rial counsel made it seem like the video evidence that *was* admitted was the only audio/visual evidence that had existed" but the members did not know "that was not factually accurate." Appellant points to one sentence in trial counsel's argument on findings:

> The extent to which they're either support[ed] by or contradicted by the evidence; the evidence that the [G]overnment has presented in this case corroborates itself. The witnesses tell stories

> that corroborate each other. Whether it's the witnesses who all saw the gun or whether it's [AL] telling you about being threatened with a hitch and then [Appellant's girlfriend] coming in and telling you on the back end that [Appellant] had threatened him with a hitch. All of the evidence corroborates each other. *And to top it all off, there is video evidence that corroborates every story, except the story that [Appellant] told the police when he was arrested.* Consider how the evidence corroborates.

Similarly, Appellant claims the "statement was untrue and a mischaracterization of the evidence as there was no video corroborating the story of Ms. CM (because that video had been destroyed)."

The Government argues trial counsel did not err because "that portion of the trial counsel's argument centered on video footage that was presented as evidence during the trial." Specifically, the Government notes trial counsel later added,

> You need to consider the testimony you heard. You need to consider the evidence of the documents, of the video that showed exactly what happened. You also need to consider your common sense and your knowledge of the way that the world works. So, remember that as we're discussing the evidence. And I ask you to consider all the circumstances, this is what I'm talking about.

We agree with the Government's interpretation, and do not read trial counsel's argument to suggest that the only video footage that ever existed was introduced into evidence. Trial counsel argued that the video footage in evidence corroborated the witness testimony. However, we agree with Appellant that such evidence did not, in fact, "corroborate every story, except the story that [Appellant] told the police when he was arrested." Even so, we do not find misconduct here where the prosecutor used mild exaggeration to argue the weight the members should give the evidence. *See* R.C.M. 919(b) ("Argument may properly include reasonable comment on the evidence in the case, including inferences to be drawn therefrom, in support of a party's theory of the case.").

### *f. Collective Error*

Appellant asserts "The military judge, to his credit, acted with vigilance to *sua sponte* raise objections or sustain defense-raised objections to the misconduct; however, the volume and pervasiveness of the misconduct surpassed the point at which instructions could save the day" and, quoting *Fletcher*, 62 M.J. at 184, that "reversal is 'required.'" We disagree. To be sure, this court "can order a rehearing based on an accumulation of errors that do not individually warrant a reversal." *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011).

The errors in this case, however, were not so extreme or pervasive as in *Voorhees* or *Hornback*, where our superior court did not reverse the findings based on prosecutorial misconduct. Appellant has not shown a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *See Norwood*, 81 M.J. at 20. We find Appellant was not denied a fair trial due to these errors. *See Pope*, 69 M.J. at 335.

### C. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "In resolving questions of legal sufficiency," we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Bright*, 66 M.J. 359, 365 (C.A.A.F. 2008) (internal quotation marks and citations omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing R.C.M. 918(c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (alterations in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*,

76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### 2. Aggravated Assault with a Dangerous Weapon

Appellant challenges the legal and factual sufficiency of his conviction for aggravated assault with a dangerous weapon on the Government's failure to prove: (1) that Appellant specifically intended to do bodily harm, and (2) that the firearm was loaded. We find merit to this issue, and determine a conviction on the lesser-included offense of simple assault with an unloaded firearm is legally and factually sufficient.

#### a. Congressional Change

Congress has delineated three categories of assault under Article 128, UCMJ, 10 U.S.C. § 928. Two of those categories are assault and aggravated assault:

> (a) ASSAULT.—Any person subject to this chapter who, unlawfully and with force or violence—
>
>> (1) attempts to do bodily harm to another person;
>>
>> (2) offers to do bodily harm to another person; or
>>
>> (3) does bodily harm to another person;
>
> is guilty of assault and shall be punished as a court-martial may direct.
>
> (b) AGGRAVATED ASSAULT.—Any person subject to this chapter—
>
>> (1) who, with the intent to do bodily harm, offers to do bodily harm with a dangerous weapon;
>>
>> (2) who, in committing an assault, inflicts substantial bodily harm or grievous bodily harm on another person; or
>>
>> (3) who commits an assault by strangulation or suffocation;
>
> is guilty of aggravated assault and shall be punished as a court-martial may direct.

Article 128(a)–(b), UCMJ, 10 U.S.C. § 928(a)–(b).

For Appellant to be convicted of aggravated assault with a dangerous weapon (Specification of Charge V), the Government was required to prove beyond a reasonable doubt, that at the time and place alleged, (1) Appellant offered to do bodily harm to AB by brandishing a firearm at her, (2) Appellant made the offer with the intent to do bodily harm, (3) the offer was made with a dangerous weapon, and (4) the dangerous weapon was a loaded firearm. 10

U.S.C. § 928(b)(1); *see Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 77.b.(4)(a)(i)–(iv).

The version of Article 128(b), UCMJ, in effect before 1 January 2019, did not require an intent to do bodily harm to be guilty of aggravated assault with a dangerous weapon; it proscribed "an assault with a dangerous weapon or other means or force likely to produce death of grievous bodily harm." *Manual for Courts-Martial, United States* (2016 ed.), App. 2, at A2-37; *see, e.g., United States v. Griffin*, 50 M.J. 480, 482 (C.A.A.F. 1999) ("[S]pecific intent is not an element of [ ] the offense of assault with a dangerous weapon . . . ."); *United States v. Axelson*, 65 M.J. 501, 513 (A. Ct. Crim. App. 2007) ("Aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm (as defined in the UCMJ) is an offense that does not include a specific intent *mens rea* element, but includes a physical component."); *United States v. Wall*, 15 M.J. 531, 534 (A.F.C.M.R. 1982) ("[A]ssault with a dangerous weapon is a general intent crime."). The *Analysis of Punitive Articles*, at *MCM*, ¶ 77, A17-13, provides some explanation for this change:

> *2018 Amendment*: a. *Text of statute.* (b) *Aggravated Assault.* Two amendments to this statute align it more closely with federal civilian practice under 18 U.S.C. § 113. First, the phrase "or other means or force likely to result in death or grievous bodily harm" has been removed from the statutory definition of "aggravated assault," and replaced with the phrase "dangerous weapon." This eliminates the likelihood of harm analysis previously necessary under the MCM (2016 edition) for this offense, *and allows the offense to focus solely on the intent of the accused*. In turn, the phrase "dangerous weapon" focuses on the capability of any object to inflict death or grievous bodily harm. . . . *Second, "the intent necessary to complete an aggravated assault is modified to no longer require the specific intent to commit substantial or grievous bodily harm*. This change aligns the specific intent requirement to federal civilian law under 18 U.S.C. § 113."[9]

(Emphasis added).

---

[9] 18 U.S.C. § 113(a)(3) reads: "Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: [ ] Assault with a dangerous weapon, with intent to do bodily harm, by a fine under this title or imprisonment for not more than ten years, or both."

### b. Analysis and Conclusion

In summary, military jurisprudence did not require any specific intent to be guilty of an offer-type aggravated assault with a loaded firearm, but Congress changed that; Article 128, UCMJ, now requires the specific intent to do bodily harm, however slight. The result is that the offense of aggravated assault under Article 128, UCMJ, does not proscribe pointing a loaded firearm at another in order merely to scare that person.[10] Here lies the question of legal sufficiency of Appellant's conviction for aggravated assault. We find the evidence does not support the element of specific intent to do bodily harm to AB.

The Government urges us to find this element was proved with circumstantial evidence. The Government argues the evidence shows Appellant did not intend to scare AB with the firearm, but instead intended to shoot her:

> [A]ny thought of simply scaring or intimidating Ms. AB had long since passed as it has already failed multiple times. Instead, an enraged Appellant now showed his intent to cause bodily harm to Ms. AB by raising the loaded firearm that he kept in his vehicle and pointing it towards Ms. AB.
>
> . . . .
>
> Appellant was angry, had been repeatedly disrespected, and was not going to let someone, whom he would later refer to as a "stupid bitch," laugh at a "hard-hitting" guy from the street and get away with it. This was no attempt to merely scare or intimidate Ms. AB. Appellant intended to harm Ms. AB.

The Government argued the evidence on which this inference is based is that Appellant's previous attempts to scare AB had failed. However, the Government identified only one potential attempt to scare or intimidate AB—the language directed at "pretty boy." Inferences are drawn from evidence—direct or circumstantial. *See Long*, 81 M.J. at 368. Factfinders can consider the evidence through the lens of their "experiences with people and events in weighing the probabilities" before drawing inferences. *Id*. "[C]ourts and juries every

---

[10] The offense of simple assault under Article 128, UCMJ, does not require intent to do bodily harm; an offer is sufficient. *See MCM*, pt. IV, ¶ 77.a.(2). However, the sentence aggravator—increasing the maximum period of confinement from three months to three years, and authorizing punitive discharges—applies to an "*unloaded* firearm." *See MCM*, pt. IV, ¶ 77.d.(1)(b). The offense of simple assault in federal jurisprudence also does not require specific intent; for an offer-type assault, it requires that the victim be put in reasonable apprehension of immediate bodily harm. *See United States v. Guilbert*, 692 F.2d 1340, 1343–44 (11th Cir. 1982), *cert. denied*, 460 U.S. 1016 (1983), and *United States v. Gauvin*, 173 F.3d 798, 802 (10th Cir. 1999) (considering the meaning of "assault" in 18 U.S.C. § 113).

day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred." *United States v. Williams*, 553 U.S. 285, 306 (2008) (quoting *American Communications Ass'n* v. *Douds*, 339 U.S. 382, 411 (1950) (citing 2 J. Wigmore, Evidence §§ 244, 256 *et seq.* (3d ed. 1940))).

The weight of the evidence supporting an inference of Appellant's intent to inflict bodily harm on AB is meager. Most telling is what the evidence does not show in this case. For example, the evidence does not show that Appellant had ever fired at a person, ever said he would fire at a person, had a beef with AB personally, indicated he wanted AB harmed, had his finger on the trigger, or fired a warning shot. Based on the evidence presented, no rational trier of fact would find the leap from Appellant "scaring or intimidating" AB to Appellant intending to use his firearm to inflict bodily harm to be a reasonable inference.[11] For this reason, the element that Appellant specifically intended to cause bodily harm to AB is not supported by the record.

The Courts of Criminal Appeals may "narrow the scope of an appellant's conviction to that conduct it deems legally and factually sufficient." *United States v. English*, 79 M.J. 116, 120 (C.A.A.F. 2019). This includes the authority to set aside a finding of guilty and affirm a lesser included offense. Article 66(f)(1)(a)(i), UCMJ, 10 U.S.C. § 866(f)(1)(a)(i). "Appellate courts have authority to set aside a finding of guilty and affirm only a finding of a lesser-included offense." *United States v. Riley*, 50 M.J. 410, 415 (C.A.A.F. 1999) (citing Article 59(b), UCMJ, 10 U.S.C. § 859(b)). However, an "appellate court may not affirm an included offense on a theory not presented to the trier of fact." *Id.* (internal quotation marks and citation omitted).

"Whether one offense is a lesser included offense of another offense is a question of law." *United States v. Gonzales*, 78 M.J. 480, 483 (C.A.A.F. 2019) (citation omitted). An offense is a lesser included offense when it is "necessarily included in the offense charged." *See United States v. Medina*, 66 M.J. 21, 24 (C.A.A.F. 2008) (quoting Article 79, UCMJ, 10 U.S.C. § 879). The United States Court of Appeals for the Armed Forces (CAAF) has explained:

> The "elements test" determines whether an offense is "necessarily included in the offense charged" under Article 79, UCMJ. We have applied the elements test in two ways. The first way is by comparing the statutory definitions of the two offenses. An

---

[11] If MJ or "pretty boy" was present and the alleged victim of the aggravated assault specification, our analysis likely would be different. In addition to the "hard hitting" comment, as noted above, the evidence shows Appellant had earlier warned MJ in the store, "Stay out of this, man, you don't want to get hurt."

offense is a lesser included offense of the charged offense if each of its elements is necessarily also an element of the charged offense. The second way is by examining the specification of the charged offense. An offense can also be a lesser included offense of the charged offense if the specification of the charged offense is drafted in such a manner that it alleges facts that necessarily satisfy all the elements of each offense.

*United States v. Armstrong*, 77 M.J. 465, 469–70 (C.A.A.F. 2018) (citations omitted).

The elements of simple assault are that (1) the accused attempted to do or offered to do bodily harm to a certain person; (2) the attempt or offer was done unlawfully; and (3) the attempt or offer was done with force or violence. 10 U.S.C. § 928(a); *see MCM*, pt. IV, ¶ 77.b.(1)(a)–(c). When simple assault is committed with an unloaded firearm, the maximum punishment is increased. *See MCM*, pt. IV, ¶ 77.d.(1)(b). At trial, the Defense affirmatively did not object to the military judge instructing the members that "simple assault with a firearm" was a lesser-included offense to the aggravated assault alleged in the Specification of Charge V.[12] Appellant does not take a different position on appeal.

We find the evidence both legally and factually sufficient to support Appellant's conviction for simple assault with an unloaded firearm as a lesser included offense under the Specification of Charge V, by excepting the words "with the intent to inflict bodily harm," "dangerous," and "loaded." The Government introduced sufficient evidence to prove beyond a reasonable doubt Appellant offered to do bodily harm to AB, that he did so unlawfully, and that he did so with force or violence by using a firearm. Moreover, we find the Specification of Charge V alleged each of these elements either expressly or by necessary implication.

Accordingly, we set aside Appellant's conviction for aggravated assault with a dangerous weapon in violation of Article 128, UCMJ. Further, we except the words "with the intent to inflict bodily harm," "dangerous," and "loaded" from the Specification of Charge V, find Appellant not guilty of the excepted words, and find him guilty of the lesser included offense of simple assault with an unloaded firearm in violation of Article 128, UCMJ, and guilty of the remaining words in the specification.

---

[12] As such, Appellant waived this issue. *See United States v. Rich*, 79 M.J. 472 (C.A.A.F. 2020).

### *c. Sentence Reassessment*

Having modified the findings, we have considered whether we may reliably reassess Appellant's sentence in light of the factors identified in *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013). We conclude that we can. First, the modification results in a significant change to the penalty landscape and Appellant's exposure, but not necessarily a "dramatic" one. *See id.* at 15. Appellant's conviction for simple assault with an unloaded firearm rather than aggravated assault with a dangerous weapon reduces the maximum imposable term of confinement for the combined convictions from 16.5 years 11.5 years; the remaining elements of the maximum punishment are unchanged. Appellant's aggravated assault conviction carried the highest maximum term of confinement—eight years—and the military judge imposed the longest term confinement—18 months—for that offense, concurrent with the terms of confinement for the other offenses. The lesser included offense of simple assault when committed with an unloaded firearm is punishable by three years in confinement and a dishonorable discharge, and remains the most serious of Appellant's offenses in terms of maximum punishment. *See MCM*, pt. IV, ¶ 77.d.(1)(b).

We find the remaining *Winckelmann* factors also favor reassessment. Appellant was sentenced by a military judge alone, who imposed specific terms of confinement for each offense. Next, the affirmed lesser-included offense and remaining convictions very much "capture the gravamen of [the] criminal conduct included within the original offenses." *Winckelmann*, 73 M.J. at 16. Finally, the remaining offenses are of a type with which the judges of this court have "experience and familiarity." *Id.* Accordingly, we find sentence reassessment is appropriate.

The next question is what sentence the military judge would have imposed had he convicted Appellant of the lesser-included offense of simple assault with a firearm under the Specification of Charge V rather than the charged offense. *See id.* at 15 (holding Courts of Criminal Appeals may reassess a sentence if it "can determine to its satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity") (quoting *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986)). Taking all factors into consideration, we conclude that the military judge would have imposed a sentence of at least ten months in confinement for the Specification of Charge V, to be served concurrently with the other specifications. Accordingly, we reassess the sentence to consist of a bad-conduct discharge, confinement for a total of ten months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

### 3. Breach of the Peace

Appellant challenges the legal and factual sufficiency of his conviction for breach of the peace (the Specification of Charge IV) on the bases that (1) the appropriate definition for "provoking" words requires the person to whom the words are directed to be present, and here, the individual was not present; (2) the alleged criminal conduct is constitutionally protected speech and does not fall within the constitutional carve-out for "fighting words;" and (3) no actual breach of the peace resulted from the charged speech. We find these arguments unconvincing.

The elements of the offense of breach of the peace under Article 116, UCMJ, generally are that (1) the accused caused or participated in a certain act of a violent or turbulent nature, and (2) the peace was thereby unlawfully disturbed. *See MCM*, pt. IV, ¶ 54.b.(2). The *MCM* provides some explanation of the offense:

> A breach of the peace is an unlawful disturbance of the peace by an outward demonstration of a violent or turbulent nature. The acts or conduct contemplated by this article are those which disturb the public tranquility or impinge upon the peace and good order to which the community is entitled. Engaging in an affray and unlawful discharge of firearms in a public street are examples of conduct which may constitute a breach of the peace. Loud speech and unruly conduct may also constitute a breach of the peace by the speaker. A speaker may also be guilty of causing a breach of the peace if the speaker uses language which can reasonably be expected to produce a violent or turbulent response and a breach of the peace results. The fact that the words are true or used under provocation is not a defense, nor is tumultuous conduct excusable because incited by others.

*MCM*, pt. IV, ¶ 54.c.(2).

The *MCM* also provides sample language to craft a specification, including "wrongfully engaging in a fist fight . . . with [another]," "using the following provoking language (toward [another])," and "wrongfully shouting and singing in a public place." *MCM*, pt. IV, ¶ 54.e.(2). Tracking the second of these three examples, the Specification of Charge IV alleged Appellant "did . . . cause a breach of the peace by using the following provoking language toward AB, to wit: 'Tell that pretty boy in there that there are some hard hitting people in these streets, and he better watch his back,' or words to that effect."

From our review of the record, we find a rational factfinder could determine the Government proved the elements of the offense of breach of the peace beyond a reasonable doubt. First, Appellant "caused or participated in a certain

act of a violent or turbulent nature" by telling to AB to "Tell that pretty boy mother f[**]ker in there he needs to watch his ass, there are some hard hitting guys in the streets." Appellant was loud and used profanity. The substance of his language could reasonably be expected to produce a turbulent response. Indeed, it did. AB responded by using profanity when essentially ejecting Appellant from the property. Appellant then escalated the already-turbulent situation by brandishing a firearm. Alternatively, one could reasonably expect Appellant's words to trigger a violent reaction either directly or via AB's anticipated communication to "pretty boy."

We do not read the words in a vacuum; we consider the context in which they were made. *Cf. United States v. Brown*, 65 M.J. 227, 231–32 (the CAAF examined the offense of communicating a threat and noted "[c]ontext gives meaning to literal statements" while criticizing "[d]ivorcing [words] from their surroundings"). Before Appellant uttered the charged words, he told MJ to "stay out of this" unless he wanted "to get hurt;" left the store then returned in his car; engaged in a "high volume," "joint cursing conversation" with others outside the store; then yelled a warning to AB that "pretty boy" inside the store was in danger. We can infer Appellant's countenance and meaning at the time he yelled these words from his subsequent act of brandishing a firearm, which emphasized and clarified his point.

For similar reasons, we find, contrary to Appellant's claim, that a rational factfinder could find Appellant's language unlawfully disturbed the peace. Appellant's words were directed at a store employee in a public place with other customers present. The public is entitled to tranquility, peace, and good order, and Appellant's language disturbed those. AB testified that she had not given Appellant "a second thought" until he "pulled up" near her outside the store and said the "pretty boy" language. According to the customer PF, his attention was drawn when Appellant "started yelling out the window of the car." Still watching Appellant after he uttered the charged language, both AB and PF saw Appellant draw a firearm and AL push the firearm down. AB immediately went into the store to report the incident. The evidence of Appellant's warning to AB about "pretty boy," and of the surrounding context, was sufficient to prove a "disturbance of the peace by an outward demonstration of a violent or turbulent nature." *See MCM*, pt. IV, ¶ 54.c.(2). Thus, a rational factfinder could determine that Appellant caused or participated in a certain act of a violent or turbulent nature and the peace was thereby unlawfully disturbed.

Appellant invites us to apply the case law and Manual provisions relating to Article 117, UCMJ, *Provoking speeches or gestures*, *MCM*, pt. IV, ¶ 55.c., in our consideration of Appellant's conviction under Article 116, UCMJ. Appellant points out that the Government alleged Appellant caused a breach of the peace by using "provoking language toward" AB, and argues that "[w]hen

charged in this manner, Article 116 closely mirrors Article 117" and "should be similarly limited to criminalize only word [sic] that meet the President's definition of 'provoking' words and constitute 'fighting words' under controlling case law."

We understand Appellant's argument to be that because the Government alleged Appellant caused a breach of the peace by using provoking words, the explanations in the *MCM* for Article 117, UCMJ, regarding "provoking" applies to this Article 116, UCMJ, offense. Specifically, Appellant asks us to find that the law requires "the person to whom the words [are] directed to be present" for Appellant to be guilty of breach of the peace as alleged in the Specification of Charge IV. It follows, Appellant claims, that he could not have breached the peace by using language directed toward but not in the presence of "pretty boy in there," when said to and in the presence of AB outside. We are not persuaded.

We reject Appellant's contention that the law requires "the person to whom the words [are] directed to be present" for Appellant to be guilty of the Specification of Charge IV. We begin our analysis with the plain words in the *MCM* providing a general explanation of Article 117, UCMJ:

> *As used in this article*, provoking and reproachful describe those words or gestures which are used in the presence of the person to whom they are directed and which a reasonable person would expect to induce a breach of the peace under the circumstances.

*MCM*, pt. IV, ¶ 55.c.(1) (emphasis added). This explanation of Article 117, UCMJ, plainly limits it to Article 117, UCMJ. The *MCM* does not expand the limitation "as used in this article" when the Government uses the sample specification language of "provoking language" provided in the *MCM* for Article 116, UCMJ.

Appellant notes that "[t]he members [ ] were never instructed as to the definition for 'provoking language.'" Indeed, at trial the Defense did not request any special instruction on "provoking language" and had no objection to the military judge's definitions for the Specification of Charge IV. Accordingly, Appellant has waived a claim of instructional error. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (holding an appellant waives a right to raise the issue on appeal where he "affirmatively declined to object to the military judge's instructions and offered no additional instructions").

Next, Appellant argues that the absence of "fighting words" in the charged language makes it constitutionally protected speech. While "fighting words"

may be one category of prohibited speech, it is not the only one.[13] Indeed, "there are categories of communication and certain special utterances to which the majestic protection of the First Amendment[14] does not extend because they 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Bose Corp. v. Consumers Union*, 466 U.S. 485, 504 (1984) (quoting *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572 (1942)).[15] As the CAAF has noted, "the right to free speech is not absolute, and some speech—e.g., dangerous speech, obscenity, or fighting words—is not protected by the First Amendment, regardless of the military or civilian status of the speaker." *United States v. Wilcox*, 66 M.J. 442, 447 (C.A.A.F. 2008) (citing *United States v. Brown*, 45 M.J. 389, 395 (C.A.A.F. 1996)) (additional citations omitted).

Believing "pretty boy" was AB's son and arguably referring to himself as the "hard-hitting" type, Appellant in essence told AB that "pretty boy" was in danger of Appellant shooting him. These words had a meaningful effect on AB: she tried to laugh it off and told Appellant to "get the f[**]k out of [her] parking lot" and "not come back." Appellant's yelling and cursing the charged language did "disturb the public tranquility or impinge upon the peace and good order to which the community is entitled." *See MCM*, pt. IV, ¶ 54.c.(2). Appellant's "pretty boy" threat was not an "essential part of any exposition of ideas," had arguably no "social value," and "any benefit . . . [was] clearly outweighed by the social interest in order and morality." *See Bose Corp.*, 466 U.S. at 485.[16] Appellant's language does not merit constitutional protection.

---

[13] We find our colleague's comparison of this case to *United States v. Thompson*, 46 C.M.R. 88 (C.M.A. 1972), inapt. The United States Court of Military Appeals (CMA) in *Thompson* considered words spoken by a prisoner to a guard. The CMA did not find that "in the circumstances of this case the [words] either tended to or were likely to provoke a reasonable guard who was outside the cell into entering and responding with violent actions or words." *Id.* at 90. We echo the CMA's conclusion that "[i]n some circumstances and to a different audience these same words and gestures might reasonably tend to precipitate a violent reaction." *Id.*

[14] U.S. CONST. amend. I.

[15] In *Chaplinsky*, the United States Supreme Court found that a state statute construed to be limited in scope to prohibit "fighting words, words . . . equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats" did not "contravene[ ] the Constitutional right of free expression." 315 U.S. at 573.

[16] In support of his dissenting opinion, our colleague quotes *Terminiello v. Chicago*, 337 U.S. 1 (1949). *Terminiello* involved a speech delivered in an auditorium during which

When viewing the trial evidence in a light most favorable to the Government, a rational factfinder readily could find the essential elements of this offense for which Appellant was convicted beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. We have reviewed the evidence, giving the appropriate deference to the trial court's ability to see and hear the witnesses, and after our own independent review of the record, we ourselves are convinced of Appellant's guilt of this specification beyond a reasonable doubt. *See United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). We therefore conclude the evidence is legally and factually sufficient to support Appellant's conviction for breach of the peace.

## III. CONCLUSION

The finding of guilty as to assault with a dangerous weapon in the Specification of Charge V is **SET ASIDE**. The words "with the intent to inflict bodily harm," "dangerous," and "loaded" are excepted from the Specification of Charge V and the excepted words are **SET ASIDE**; as to the remaining language of the Specification of Charge V, the lesser-included offense of simple assault is affirmed. We reassess the sentence to a bad-conduct discharge, confinement for ten months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The findings, as modified, and the sentence, as reassessed, are correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). The findings, as modified, and the sentence, as reassessed, are **AFFIRMED**.[17]

CADOTTE, Judge (concurring in part and dissenting in part and in the result):

I concur with the conclusions of my esteemed colleagues in the majority save one issue: I disagree that "a rational factfinder could determine that Appellant caused or participated in a certain act of a violent or turbulent nature

the speaker "condemned the conduct of the crowd outside and vigorously, if not viciously, criticized various political and racial groups whose activities he denounced as inimical to the nation's welfare." *Id.* at 2. This is an example of speech that includes an exposition of ideas and merits First Amendment protection. *Id.* at 4.

[17] The original record of trial in Appellant's case does not include a recording of the arraignment and motions held on 4 May 2021 as required by R.C.M. 1112(b)(1). However, the record does include a verbatim transcript of that proceeding. *See* R.C.M. 1114(a). Appellant did not raise this issue as error. Assuming the omission of the audio recording is substantial, we nonetheless conclude that the omission is harmless beyond a reasonable doubt in light of the presence of a certified verbatim transcript. We find that no relief is warranted.

and the peace was thereby unlawfully disturbed." For this reason I disagree that Appellant's conviction for violating Article 116, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 916,[1] was legally sufficient. I find the Government was required to prove beyond a reasonable doubt that Appellant's words were "fighting" words and the Government failed to do so. Unlike my colleagues, while viewing the evidence in the light most favorable to the Government, I conclude that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). Consequently, I would set aside the finding of guilty as to Article 116, UCMJ.

Appellant was charged with a violation of Article 116, UCMJ, which states Appellant

> [d]id, at or near Moapa, Nevada, on or about 11 January 2020, cause a breach of the peace by using the following provoking language toward [AB], to wit: "Tell that pretty boy in there that there are some hard hitting people in these streets, and he better watch his back," or words to that effect.

I generally agree with my esteemed colleagues as to their recitation of the facts. In viewing the evidence in the light most favorable to the Government, AB's testimony was the strongest evidence of the charged words presented by the Government. It bears repeating what AB testified to regarding her interaction with Appellant outside the store:

> [Appellant] pulled up to me parallel, and at this point, I had never even gave him a second thought. So when he pulls up parallel to the store to me and he yells, hey tell that pretty boy in there, he needs to watch his ass. There are some hard hitting guys in the street. I kind of chuckled at him told him to leave my store and not come back, and at this point, the [Appellant] pulls out a gun and tries to point it to me and the passenger in the vehicle like kind of like grabs his arm and was like what the hell are you doing?

AB later testified again describing Appellant's actions:

His exact words if I may, "Tell that pretty boy mother f[**]ker in there he needs to watch his ass, there are some hard hitting guys in the streets." At that time, I chuckled at him and told him to get the f[**]k out of my parking lot and

---

[1] Unless otherwise noted, all references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

that's when he pulled the gun up and then fricking, the passenger, or whoever he is, pushed the gun down and he sped off.

*Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 54.c.(2), explains that *breach of the peace*

> [ ] is an unlawful disturbance of the peace by an outward demonstration of a *violent or turbulent nature*. The acts or conduct contemplated by this article are those which disturb the public tranquility or impinge upon the peace and good order to which the community is entitled. Engaging in an affray and unlawful discharge of firearms in a public street are examples of conduct which may constitute a breach of the peace. Loud speech and unruly conduct may also constitute a breach of the peace by the speaker. A speaker may also be guilty of causing a breach of the peace if the speaker uses language which can *reasonably* be expected to produce a *violent or turbulent response* and a breach of the peace results. The fact that the words are true or used under provocation is not a defense, nor is tumultuous conduct excusable because incited by others.

(Emphasis added).

We must be mindful of our obligation to ensure that Article 116, UCMJ, is not applied in an unconstitutionally overbroad or vague manner in violation of the First Amendment to the Constitution.[2] We must limit its statutory proscription to "fighting" words which tend to incite an immediate breach of the peace. *See Gooding v. Wilson*, 405 U.S. 518, 522 (1972). *Gooding* affirmed a lower court decision which found a Georgia breach of the peace statute, on its face, was unconstitutionally vague and overbroad. *Id.* at 518. The Court found that,

> [b]ecause earlier appellate decisions applied [the statute] to utterances where there was no likelihood that the person addressed would make an immediate violent response, it is clear that the standard allowing juries to determine guilt "measured by common understanding and practice" does not limit the application of [the statute] to "fighting" words defined by *Chaplinsky*[ *v. New Hampshire,* 315 U.S. 568, 572 (1942)].

*Id.* at 528.

The Court of Appeals for the Armed Forces considers "fighting" words as

---

[2] U.S. CONST. amend. I.

> "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." In order to be fighting words, the words must constitute a direct personal insult. Are there fighting words left? In *Buffkins v. City of Omaha, Douglas County, Nebraska*, 922 F.2d 465, 472 (8th Cir. 1990), the Court held that calling a police officer an "a[**]hole" was not considered fighting words.

*United States v. Brown*, 45 M.J. 389, 395 (C.A.A.F. 1996) (quoting *Chaplinsky* 315 U.S. at 572; and citing *Cohen v. California*, 403 U.S. 15 (1971)).

The specification Appellant was charged with was limited to his speech spoken to AB saying "[t]ell that pretty boy in there that there are some hard hitting people in these streets, and he better watch his back." Appellant was not charged with using loud speech, or exhibiting unruly conduct; rather, the Government alleged he committed a "breach of the peace" based solely by speaking the charged provoking language. Significantly, Appellant's act of raising his firearm was not included as part of the charged specification and came after the charged event. I find the evidence presented by the Government was insufficient for the members to conclude that Appellant's speech was *reasonably* expected to produce a *violent or turbulent response*.[3] "When the Government

---

[3] The explanation for breach of the peace includes speech that can reasonably be expected to produce a "turbulent response." *MCM*, pt. IV, ¶ 54.c.(2). A "turbulent response," in the context of criminalizing the language used by a speaker, must rise to the level of "fighting" words. In *Terminiello v. Chicago*, 337 U.S. 1, 9 (1949), the United States Supreme Court reversed a conviction for a violation of a city disorderly conduct ordinance concluding the ordinance was unconstitutional as construed and applied. The Court reasoned,

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

*Id.* at 5–6 (citing *Chaplinsky*, 315 U.S. at 571–72; then citing *Bridges* v. *California*, 314 U.S. 252, 262 (1941); and then citing *Craig* v. *Harney*, 331 U.S. 367, 373 (1947)). The

makes speech a crime, the judges on appeal must use an exacting ruler." *United States v. Brison*, 49 M.J. 360, 361 (C.A.A.F. 1998) (citations omitted).

Appellant's words were not directed to the recipient of the speech and were not words that would incite an immediate violent response or breach of the peace. The impact of Appellant's words on the listener, AB, did not cause her to respond in a violent manner. In fact, she "chuckled at him" and then just "told him to get the f[**]k out of [her] parking lot." Appellant's words could be interpreted as either a warning, or potentially a threat, to be passed on to "pretty boy" that he needed to watch out for "some hard hitting guys in the street." There was no evidence that "pretty boy" was present at the time Appellant's words were spoken; as a result, their utterance could not incite an immediate breach of the peace. The United States Court of Military Appeals found an appellant's words, "[d]on't yell at me or I'll wring your – neck," spoken to a stockade guard did not qualify as "fighting words" and considered them as "more in the nature of a challenge or threat or perhaps a combination of the two." *United States v. Thompson*, 46 C.M.R. 88, 88–90 (C.M.A. 1972). Here, it cannot be said that "violence was the natural and probable consequence" of the words spoken by Appellant. *Id.* at 90. Consequently, I find the evidence is not legally sufficient to support Appellant's conviction for breach of the peace.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

Court found the city ordinance, as construed by the trial court, "permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand." *Id.* at 5.